******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOHN GIROLAMETTI, JR., ET AL. *v.* JAMES R. LARRABEE ET AL.

JOHN GIROLAMETTI ET AL. *v.* CITY OF DANBURY ET AL.

JOHN GIROLAMETTI ET AL. *v.* MICHAEL HORTON ASSOCIATES, INC.
(AC 47559)
(AC 47560)
(AC 47561)
(AC 47563)

Seeley, Wilson and Keller, Js.[*]

*Syllabus*

The defendant city of Danbury and the defendant E, the city's deputy chief building inspector, appealed from the trial court's judgments for the plaintiffs in their actions alleging, inter alia, a statutory (§ 52-557n (b) (7) and (8)) cause of action for reckless disregard for health or safety in the issuance of permits and the making of inspections, in connection with the build-out of the plaintiffs' party goods store. The city claimed, inter alia, that the court erred in charging the jury that the plaintiffs could recover against the city in a direct action pursuant to § 52-557n (b) (7) and (8). *Held*:

The trial court properly instructed the jury that the plaintiffs could recover damages in a direct action against the city pursuant to § 52-557n (b) (7) and (8), as subdivisions (7) and (8) of that statute specifically abrogate governmental immunity in circumstances in which a municipality's conduct or that of its employee in the issuance, denial, suspension or revocation of any permit or in the making of inspections constitutes a reckless disregard for health or safety.

This court rejected the city's alternative claim that causes of action brought pursuant to § 52-557n (b) (7) and (8) should derive only from a city policy to issue permits or conduct inspections with reckless disregard for health or safety, or a formal citywide practice to recklessly issue permits or conduct inspections that was so pervasive that it was the functional equivalent of city policy, as the language of § 52-557n (b) (7) and (8) is clear and unambiguous and did not include such a requirement.

The trial court did not err in its charge to the jury with respect to the proper legal standard for recklessness under § 52-557n (b) (7) and (8), as, to the extent

[*]This case originally was argued before a panel of this court consisting of Judges Seeley, Wilson and Prescott. Thereafter, Judge Keller was substituted for Judge Prescott, and she has read the briefs and appendices, and has listened to a recording of the oral argument prior to participating in this opinion.

the court explained common-law principles of recklessness to the jury, it properly guided the jury in determining the issues before it.

The trial court did not err in denying the defendants' motions to set aside the verdict and for judgment notwithstanding the verdict, as there was sufficient evidence from which the jury could reasonably and legally conclude that the defendants acted in reckless disregard for health and safety under §52-557n (b) (7) and (8).

The trial court erred in denying the city's motion for remittitur as to the damages assessed against the city in the amount of a pretrial settlement that was reached between the plaintiffs and the plaintiffs' architect in a separate action, as the settlement payment of $280,000, when added to the jury's award, rendered that award excessive as a matter of law because it would have resulted in a level of compensation that so exceeded the evidence of what was fair and reasonable as to be unconscionable, and it was appropriate for the jury's award of damages to be reduced by $280,000.

Argued April 28, 2025—officially released March 17, 2026

*Procedural History*

Action, in each of four cases, to recover damages for, inter alia, negligence, and for other relief, brought to the Superior Court in the judicial district of Danbury, where the city of Danbury intervened as a defendant in two cases; thereafter, the cases were transferred to the judicial district of Waterbury, Complex Litigation Docket, and consolidated for trial to a jury before *Pierson, J.*; verdicts for the plaintiffs; subsequently, the court denied the motions to set aside the verdict and for judgment notwithstanding the verdict filed by the defendant city of Danbury et al. and rendered judgments in accordance with the verdicts; thereafter, the court denied the motion for remittitur filed by the defendant city of Danbury, and the defendant city of Danbury et al. appealed to this court. *Reversed in part*; *further proceedings*. *Thomas R. Gerarde*, with whom was *Adam J. DiFulvio*, for the appellants (defendant city of Danbury et al.).

*Brian J. Donnell*, for the appellees (plaintiffs).

*Tadhg Dooley* filed a brief for the Connecticut Conference of Municipalities as amicus curiae.

*Opinion*

WILSON, J. In this opinion, we resolve claims raised in four separate but related appeals, Docket Nos. AC 47559, AC 47560, AC 47561, and AC 47563.[1] In the four related civil actions underlying these appeals, which were consolidated by the trial court, the plaintiffs, John Girolametti, Jr. (John Girolametti), Cindy Girolametti, 43 South Street, LLC (43 South Street), and Party Depot, Inc. (Party Depot), brought claims against several defendants, including the city of Danbury (city), its deputy chief building inspector, Edward Schullery, and various contractors and sub-subcontractors, all of whom were involved in the construction of an expansion to a party goods store in Danbury that was owned by John Girolametti and Cindy Girolametti through 43 South Street.[2]

---

[1] On June 14, 2024, this court consolidated the appeals that were filed in Docket Nos. AC 47559, AC 47560, and AC 47561. This court heard argument with respect to the appeal filed in Docket No. AC 47563 on April 28, 2025, the same day argument was heard with respect to the consolidated appeals.

[2] The first action, *Girolametti* v. *Danbury*, Superior Court, judicial district of Waterbury, Docket No. CV-10-6011711-S, was brought by the plaintiffs against the city; Leo P. Null; Edward Schullery; Rizzo Corporation; Michael Horton Associates, Inc.; Test-Con, Inc.; Lindade Construction, Inc.; Dominic Quaraglia Engineering; and Girard & Co. In this action, Aschettino Associates, LLC, was an intervening party.

The second action, *Girolametti* v. *Test-Con, Inc.,* Superior Court, judicial district of Waterbury, Docket No. CV-11-6011712-S, was brought by the plaintiffs against Test-Con, Inc.; Aschettino Associates, LLC; and the city.

The third action, *Girolametti* v. *Michael Horton Associates, Inc.*, Superior Court, judicial district of Waterbury, Docket No. CV-11-6011734-S, was brought by the plaintiffs against Michael Horton Associates, Inc.; Rizzo Corporation; VP Buildings, Inc.; Russell James Larrabee; Dominic Quaraglia Engineering, Inc.; Lindade Construction, Inc.; Aschettino Associates, LLC; Test-Con, Inc.; the city; VP Buildings, Inc. (also known as Varco Pruden Buildings, A Division of Blue Scope North America, Inc.); Blue Scope Buildings North America, Inc.; Steven J. Oakeson, P.E.; Pat Munger Construction Company, Inc.; Leo P. Null; and Edward Schullery. In this action, Brady J. Broom, P.E.; the city; and CMC/ Broom were intervening parties.

The fourth action, *Girolametti* v. *Larrabee*, Superior Court, judicial district of Waterbury, Docket No. CV-14-6025392-S, was brought by the plaintiffs against James R. Larrabee, AIA; Aschettino Associates,

Following a jury trial, the jury returned a verdict in favor of the plaintiffs as against the city in the amount of $16,593,750 and as against Schullery in the amount of $250,000. The court rendered judgments in all four actions in accordance with the verdicts. Following the denial of various postverdict motions filed by the defendants, the city brought three appeals—AC 47559, AC 47560, and AC 47561—from the judgments rendered in three of the four actions in favor of the plaintiffs in accordance with the jury's award of damages and the denial of its motion for remittitur. In Schullery's appeal—AC 47563—Schullery likewise brought an appeal from the judgments rendered in three of the four actions in favor of the plaintiffs following the denial of his postverdict motions.[3]

The city claims that the court erred (1) in charging the jury that the plaintiffs could recover damages in a direct action against the city, pursuant to General Statutes § 52-557n (b) (7) and (8), for reckless disregard for health or safety with respect to the issuance of permits and the making of inspections; (2) in charging the jury that, in deciding liability under § 52-557n (b) (7) and (8), the city, a Connecticut public entity, could be held liable for recklessness based on the same standard of proof of recklessness that applies to individuals; (3) in rendering judgment against the city notwithstanding the lack of sufficient evidence to support a jury finding of reckless disregard for health or safety as to the issuance of permits and the making of inspections in violation of § 52-557n

LLC; Commercial Metals Company doing business as CMC Steel Fabricators, Inc., also known as CMC Joist & Deck; Steel Dynamics, Inc., doing business as New Millenium Building Systems; and Brady J. Broom, P.E. In this action, Test-Con, Inc., and the city were intervening parties.

A fifth action, *Girlolametti* v. *VP Buildings, Inc.*, Superior Court, judicial district of Waterbury, Docket No. CV-11-6013808-S, was also consolidated with these four other actions, but it was later withdrawn.

One of the defendants in these actions is identified as both James R. Larrabee and Russell James Larrabee. For the sake of clarity, we refer to him as Russell James Larrabee.

[3] The city and Schullery are the only defendants participating in this appeal. We refer to them collectively as the defendants and individually by name where appropriate.

(b) (7) and (8); and (4) declining to order a remittitur as to the damages assessed against the city in the amount of the presuit settlement between the plaintiff and a former defendant, Russell James Larrabee. See footnote 2 of this opinion. Schullery claims that the court erred in rendering judgment against him notwithstanding the lack of sufficient evidence to support a jury finding of reckless disregard for health or safety as to the issuance of permits and the making of inspections in violation of § 52-557n (b) (7) and (8). We agree with the city that the court erred in its analysis of the city's motion for a remittitur, and we remand the case with direction to grant the motion for remittitur. We disagree with the remaining claims raised by the city and the claim raised by Schullery and, thus, affirm the judgments in all other respects.

The complicated and prolonged facts and procedural history underlying these appeals is cogently set forth in the March 27, 2024 memorandum of decision of the trial court, *Pierson, J.*, denying the defendants' motions to set aside the verdict and for judgment notwithstanding the verdict, which are a subject of the present appeal. The court stated: "This action, which has a long history, involve[d] the construction of a commercial building at 43 South Street, Danbury, Connecticut (property), used for operating a wholesale and retail party goods store. The plaintiffs allege[d] that in June, 2007, a non-party—Rizzo Corporation (Rizzo)—contracted with . . . John [Girolametti] to provide construction, professional engineering, and architectural services for the construction of a building at the property, known as the 'Party Depot building.' Rizzo filed documents with the city Department of Buildings for the purpose of obtaining building permits, required inspections, and a certificate of occupancy for the Party Depot building. The plaintiffs [alleged] that, despite the inadequacy of these filings—including without limitation, the failure to meet requirements imposed by the . . . General Statutes and building code of the state of Connecticut (code)—the city Department of Buildings issued building permits

for construction of the Party Depot building and issued certificates of occupancy and compliance.

"The plaintiffs further allege[d] that the defendants, Leo P. Null,[4] as the city's chief building inspector, and . . . Schullery, as the city's deputy building inspector, administered the code and issued building permits, inspected work, and reviewed construction documents relating to the property. The plaintiffs also claim[ed] that Null and Schullery had a continuing duty to enforce the code, at least from the time the construction project documents were received for review through the time a certificate of occupancy was issued, and, further, that they had a continuing duty to respond to inquiries and notices relating to health, safety, and noncompliance with the code, following the issuance of the certificate of occupancy. The plaintiffs relied upon the defendants to carry out their duties as required by the code and other applicable law.

"In the first count [of their complaint], the plaintiffs [alleged] that the defendants acted in reckless disregard for the health and safety of the plaintiffs, their employees, and others entering upon the property, under . . . § 52-557n (b) (7), in a variety of ways, including by failing to require the timely and complete filing of permit application documents prior to issuing permits; issuing a foundation permit when the design of the foundation was incomplete and not coordinated with the design of the structure above the foundation; issuing a building permit when the building design was incomplete; failing to require the filing of adequate construction documentation prior to the performance of construction work; failing to inspect ongoing construction work properly; issuing a certificate of occupancy despite incomplete documentation, when the work performed failed to conform with documentation on file, and despite improper inspections; failing and refusing to investigate fully and in a timely manner numerous instances of noncompliance with the code; stating that the building was constructed properly when it was not so constructed; and failing to

---

[4] "Following his death, the claims against . . . Null were withdrawn."

administer the code. Further, according to the plaintiffs, by failing to perform their duty to enforce the provisions of the code, the defendants knew that various aspects of the project did not meet basic code standards, and they knew—or it was foreseeable to them—that the overall structure failed to meet basic standards for the applicable building type under the code.

"In the second count, the plaintiffs allege[d] that the defendants failed to inspect the property, or made inadequate or negligent inspections of the property, where such failure constituted a reckless disregard for health and safety under all the relevant circumstances, under . . . § 52-557n (b) (8), repeating some of the specifications of wrongdoing alleged in the first count, and, further, claiming that the defendants withheld information, including an evaluation by a city retained engineer, that confirmed the existence of code violations, as well as the defective design and construction of the project.

"The plaintiffs argued and presented evidence at trial in support of a finding that the Party Depot building developed extensive cracking in the concrete slab of the second floor of the new portion of the building, and was otherwise plagued by structural problems and design defects, all of which posed a risk to public health and safety, thereby limiting the plaintiffs' use of the Party Depot building and causing them to suffer economic damages.

"The consolidated actions were tried before a jury . . . over a period of five weeks, in September and October, 2023. During the trial, numerous witnesses—both lay and expert—testified, and hundreds of documents were received into evidence. At the conclusion of the plaintiffs' case, both the city and Schullery moved for a directed verdict; the court reserved decision on the motions. . . . Following the conclusion of evidence and the court's charge to the jury on the applicable law, the jury returned verdicts in favor of the plaintiffs on the first and second counts of the complaint against the city and Schullery, having found **(1)** that the defendants acted with

reckless disregard for health and safety in issuing building permits and/or a certificate of occupancy for the construction project, in violation of § 52-557n, and (2) that the defendants acted with reckless disregard for health and safety in undertaking or conducting inspections and/or failing to conduct inspections, also in violation of § 52-557n. . . . The jury awarded a total of $16,843,750 to the plaintiffs as follows: (1) $16,593,750 against the city and (2) $250,000 against Schullery. . . .[5]

"Following the jury verdict, the defendants moved to set aside the verdict and for judgment notwithstanding the verdict, renewing arguments made in the motions for directed verdict. . . . In its motion, the city argued, inter alia, that a municipality is 'legally incapable' of committing acts in reckless disregard of health or safety when issuing permits or conducting inspections; alternatively, the city contended that any theory of liability based on reckless disregard for health or safety would have to be based on a formal, citywide policy, or a practice so pervasive that it was the functional equivalent of a formal policy, and that no evidence of such policies or practices was introduced at trial. The defendants also argued that insufficient evidence was introduced to support a finding that the defendants acted with reckless disregard for health and safety, as provided by § 52-557n (b) (7) and (8)." (Citations omitted; footnotes in original; footnote omitted.) The court denied both postverdict motions, as well as a motion for remittitur filed by the city. These appeals followed.

## I

### AC 47559, AC 47560, and AC 47561

We begin by addressing the claims raised by the city in AC 47559, AC 47560 and AC 47561. First, the city claims that the trial court erred in charging the jury that the plaintiffs could recover damages in a direct action

---

[5] "Prior to the trial . . . the court, *Bellis, J.*, [rendered] summary judgment in favor of the defendants on the third count of the third amended complaint. . . . The jury found in favor of Schullery on the fourth and final count of the complaint." (Citation omitted.)

against the city pursuant to §52-557n (b) (7) and (8) for reckless disregard for health or safety with respect to the issuance of permits and the making of inspections. In connection with this claim, the city argues that it was categorically immune from liability and, in the alternative, liability depended on evidence of the functional equivalent of a city policy with respect to the issuance of permits and the making of inspections. Second, the city claims that the court erred in charging the jury that the city, a Connecticut public entity, can be held liable for recklessness based on the same standard of proof of recklessness that applies to individuals, when deciding liability under §52-557n (b) (7) and (8). Third, the city claims that the court erred in rendering judgment against the city notwithstanding the lack of sufficient evidence to support a jury finding of reckless disregard for health or safety as to the issuance of permits and the making of inspections in violation of §52-557n (b) (7) and (8). Finally, the city claims that the court erred in declining to order a remittitur as to the damages assessed against it in the amount of the presuit settlement between the plaintiffs and Larrabee. We will address each claim in turn.[6]

A

Before examining the city's claims challenging the court's jury charge, we set forth the standard of review and legal principles applicable to the city's claims of instructional error.[7] "A challenge to the validity of jury instructions presents a question of law. Our review of this claim, therefore, is plenary. . . . When reviewing [a]

---

[6] The Connecticut Conference of Municipalities has submitted an amicus curiae brief in which it sets forth arguments that support the city's appeal and in which it argues that the trial court's application of §52-557n (b) conflicts with the statute's text, context, and purpose, that permitting direct liability against the city in the present circumstances "would have devastating and perverse consequences for Connecticut municipalities," and that direct liability against a municipality for recklessness in licensing and inspection should be based on "a municipal policy or practice of ignoring a particular risk of harm."

[7] Practice Book §42-16 provides in relevant part that "[a]n appellate court shall not be bound to consider [an instructional] error . . . unless

challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Therefore, [o]ur standard of review on this claim is whether it is reasonably probable that the jury was misled." **(**Citation omitted; internal quotation marks omitted.**)** *Zhuleku* v. *Naugatuck Valley Radiology Associates*, 232 Conn. App. 143, 155, 336 A.3d 101, cert. denied, 352 Conn. 907, 335 A.3d 846 (2025).

1

The city's first claim of instructional error is that it was improper for the court to instruct the jury that the plaintiffs could recover damages in a direct action against the city pursuant to § 52-557n (b) (7) and (8) for reckless disregard for health or safety with respect to the issuance of permits and the making of inspections. The city argues that, in the circumstances of this case, it is categorically immune from liability under § 52-557n. We disagree.

The city's claim that it is categorically immune from liability turns on our interpretation of § 52-557n (b) (7) and (8). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the

the matter is covered by a written request to charge or exception has been taken . . . ."

The city preserved its present claims of instructional error, first, by means of a written request to charge and, second, by means of exceptions taken to the charge.

statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . General Statutes § 1-2z directs this court to first consider the text of the statute and its relationship to other statutes to determine its meaning. If, after such consideration, the meaning is plain and unambiguous and does not yield absurd or unworkable results, we shall not consider extratextual evidence of the meaning of the statute. . . . Only if we determine that the statute is not plain and unambiguous or yields absurd or unworkable results may we consider extratextual evidence of its meaning such as the legislative history and circumstances surrounding its enactment . . . the legislative policy it was designed to implement . . . its relationship to existing legislation and common law principles governing the same general subject matter . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . We presume that the legislature did not intend to enact meaningless provisions. . . . [S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . .

"Furthermore, [i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly. . . . If a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *L. L.* v. *M. B.*, 216 Conn. App. 731, 740, 286 A.3d 489 (2022); see also *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 40, 664 A.2d 719 (1995) ("no statutory phrase or word will be interpreted as superfluous").

In addressing the city's claim of instructional error, which requires this court to interpret the language in § 52-557n, "it is helpful to look at § 52-557n as a whole.

As a matter of Connecticut's common law, the general rule . . . is that a municipality is immune from liability for negligence unless the legislature has enacted a statute abrogating that immunity. . . . The tort liability of a municipality has been codified in § 52-557n." (Citation omitted; internal quotation marks omitted.) *Costanzo* v. *Plainfield*, 344 Conn. 86, 106, 277 A.3d 772 (2022).

Section 52-557n (a) provides in relevant part: "(1) Except as otherwise provided by law, a political subdivision of the state *shall be liable* for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . . . (2) Except as otherwise provided by law, a political subdivision of the state *shall not be liable* for damages to person or property caused by . . . (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or implicitly granted by law. . . ." (Emphasis added.) "Thus, the statute provides that municipalities shall be liable for harm caused by ministerial acts in subsection (a) (1) (A) but shall not be liable for harm caused by discretionary acts in subsection (a) (2) (B)." *Ugrin* v. *Cheshire*, 307 Conn. 364, 382, 54 A.3d 532 (2012).

Subsection (b) of the statute further provides in relevant part: "*Notwithstanding the provisions of subsection* (*a*) *of this section*, a political subdivision of the state or any employee, officer or agent acting within the scope of his employment or official duties *shall not be liable* for damages to person or property resulting from . . . (7) the issuance, denial, suspension or revocation of, or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authorization, when such authority is a discretionary function by law, unless such issuance, denial, suspension or revocation or such failure or refusal constitutes a reckless disregard for health or safety [or] (8) [the] failure to make an inspection or making an inadequate or negligent

inspection of any property, other than property owned or leased by or leased to such political subdivision, to determine whether the property complies with or violates any law or contains a hazard to health or safety, *unless* the political subdivision had notice of such a violation of law or such a hazard or unless such failure to inspect or such inadequate or negligent inspection constitutes a reckless disregard for health or safety under all the relevant circumstances . . . ." (Emphasis added.) General Statutes § 52-557n (b) (7) and (8). "Because subsection (b) begins with the words [n]otwithstanding the provisions of subsection (a), the two parts of the statute are not interdependent, and subsection (b) may be construed without reference to subsection (a). Subsection (b) thus should be generally understood to define various circumstances in which a municipality is not subject to liability." (Internal quotation marks omitted.) *Ugrin* v. *Cheshire*, supra, 307 Conn. 381.

The statutory term "unless," which appears in § 52-557n (b) (7) and (8), "is almost universally defined as an exception to another circumstance. See Webster's Third New International Dictionary (2002) [p. 2503] (defining 'unless' as 'under any other circumstance than that: except on the condition that'); American Heritage Dictionary of the English Language (5th Ed. 2011) [p. 1896] (defining 'unless' as '[e]xcept on the condition that; except under the circumstances that'); Random House Unabridged Dictionary (2d Ed. 1993) [p. 2080] (defining 'unless' as 'except under the circumstances that . . . except'). To the extent [our Supreme Court] previously has construed the term, it has done so consistently with the foregoing definitions. See *State* v. *Ray*, 290 Conn. [602, 614, 966 A.2d 148] (2009) (words 'unless' or 'except' typically connote exception); *State* v. *Anonymous*, 179 Conn. 516, 518–19, 427 A.2d 403 (1980) (word 'unless' refers to exception) . . . ." *Ugrin* v. *Cheshire*, supra, 307 Conn. 381–82.

It is therefore reasonable to conclude that the legislature's use of the word "unless" in subsection (b) (7)

and (8) of § 52-557n expresses a legislative intent to set that subsection apart from the preceding language of the statute protecting municipalities from liability. In *Ugrin*, our Supreme Court, interpreting § 52-557n (b) (8), stated that "[t]he word 'unless' before [each of the two exceptions in subsection (b) (8) pertaining to failure to inspect and inadequate inspection] unmistakably sets them apart from the preceding language that otherwise protects municipalities from liability for failure to make an inspection or for making an inadequate inspection because it describes conditions under which there is no protection from liability." (Emphasis omitted.) *Ugrin* v. *Cheshire*, supra, 307 Conn. 382. The court also reasoned that, "if we do not interpret the language following the word 'unless' in § 52-557n (b) (8) according to its clear meaning as an exception to the general rule that failure to make an inspection or to make an adequate inspection does not give rise to municipal liability, more than one half of the provision will be rendered superfluous." Id., 383. It legally and logically follows that the interpretation utilized in *Ugrin* applies to the legislature's identical use of the word "unless" in § 52-557n (b) (7), which applies to the issuance of permits. We are also mindful that, in determining the meaning of a statute, every part of the statute should be afforded meaning. See, e.g., *Vibert* v. *Board of Education*, 260 Conn. 167, 176, 793 A.2d 1076 (2002) ("[I]n interpreting a statute, we do not interpret some clauses of a statute in a manner that nullifies other clauses but, rather, read the statute as a whole in order to reconcile all of its parts. . . . Every word and phrase is presumed to have meaning, and we do not construe statutes so as to render certain words and phrases surplusage."(Citation omitted; internal quotation marks omitted.)).

Thus, by its express terms, subsection (b) (7) of § 52-557n contemplates the imposition of liability on a municipality in cases where a "permit, license, certificate, approval, order or similar authorization" is issued with "a reckless disregard for health or safety . . . ." Subsection (b) (8) of § 52-557n contemplates the imposition

of liability where a failure to inspect or inadequate or negligent inspection of property has occurred and such failure or negligent inspection constitutes a "reckless disregard for health or safety under all the relevant circumstances . . . ."

In support of its claim that the provisions of § 52-557n (b) (7) and (8) do not allow for a direct action against a municipality, the city also argues that "[t]o hold that [§ 52-557n (b) (7) and (8)] expose a Connecticut municipality to a direct suit for recklessness, with standard of proof and liability coextensive with that of a reckless individual employee, is antithetical to the purpose of tort reform, as well as directly inconsistent with the legislative protections provided in [General Statutes] §§ 7-465, 7-101a and 10-235 against municipal liability for the reckless acts of employees." The city further argues that, "[u]nlike private corporations, the doctrine of respondeat superior [or vicarious liability] does not apply to Connecticut municipal corporations [and] a municipality can only be sued if the Connecticut legislature has passed a law allowing such suit." The city also contends that "[t]he statutes that allow a suit against a Connecticut municipality uniformly hold that the municipality will not be liable for acts of employees that are wilful, malicious, wanton, or reckless, all of which are treated the same under Connecticut law. Specifically . . . §§ 7-465, 7-101a and 10-235 all contain provisions that a Connecticut municipality will not be liable for the reckless act of the employee." The city argues that this court should harmonize the provisions of § 52-557n (b) (7) and (8) with statutes in existence at the time of its passage, including §§ 7-465, 7-101a and 10-235, and that "harmonization" of the statutory provisions could be easily achieved "by recognizing that [§ 52-557n (b) (7) and (8)] are disjunctive [subsections] whose provisions apply to municipalities *or* employees and limit the protection of immunity where there is notice of a dangerous condition *or* [where] there is [a] reckless disregard for health or safety." (Emphasis in original.) The city contends that, if § 52-557n (b) (7) and (8) are harmonized with the aforementioned

indemnification statutes, it would logically lead to the conclusion that "the reckless exception to immunity in §52-557n (b) (7) and (8) only applies to the actions of a municipal employee, and not to a municipality . . . ."

For several reasons, we are not persuaded by the city's interpretation of the statutory language at issue. Essentially, what the city is asking this court to do is to rewrite the plain language of §52-557n in subsection (b)(7) and (8) and to construe the statute as an indemnification statute like §§7-465, 7-101a and 10-235, which require a municipality to indemnify a municipal employee for damages resulting from conduct by a municipal employee while the employee was acting within the scope of his or her employment, and was not the result of wilful, wanton, reckless, or malicious conduct. We are not persuaded by the city's arguments because the city's interpretation of the statute contradicts its plain meaning. As we previously have discussed, under our guiding principles of statutory interpretation, this court looks to the plain language of the statute to determine its meaning and legislative intent. "We are bound to interpret legislative intent by referring to what the legislative text contains, not what it might have contained. . . . We will not read into clearly expressed legislation provisions which do not find expression in its words. . . . [W]e are [also] guided by the principle that the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires us to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Citation omitted; internal quotation marks omitted.) *Gamez-Reyes* v. *Biagi*, 136 Conn. App. 258, 274, 44 A.3d 197, cert. denied, 306 Conn. 905, 52 A.3d 731 (2012).

The city correctly points out that allowing a direct cause of action against a municipality is a significant departure from general common-law principles. "A municipality itself was generally immune from liability

for its tortious acts at common law . . . . Furthermore, [a]t common law, municipal officers were liable for their own torts, but the municipality, their municipal master, was not vicariously liable for those torts. . . . Governmental immunity may, however, be abrogated by statute. The state legislature possesses the authority to abrogate any governmental immunity that the common law gives to municipalities. . . . The general rule developed in the case law is that a municipality is immune from liability unless the legislature has enacted a statute abrogating that immunity. . . . Statutes that abrogate or modify governmental immunity are to be strictly construed. . . . This rule of construction stems from the basic principle that when a statute is in derogation of common law or creates a liability where formerly none existed, it should receive a strict construction and is not to be extended, modified, repealed or enlarged in its scope by the mechanics of construction." (Citations omitted; internal quotation marks omitted.) *Spears* v. *Garcia*, 66 Conn. App. 669, 677–78, 785 A.2d 1181 (2001), aff'd, 263 Conn. 22, 818 A.2d 37 (2003).

Contrary to the city's arguments, the language of § 52-557n (b) (7) and (8) is clear and unambiguous with respect to vicarious liability. The language therein plainly reflects the legislature's intent to abrogate governmental immunity that the common law gives to municipalities with respect to vicarious liability. In light of the unambiguous language in subdivisions (7) and (8) of § 52-557n (b), it is unnecessary for us to seek out extratextual guidance with respect to the legislature's intent. See id., 678–79 ("[b]ecause the words of the statute themselves are clear on the matter, we need not embark on an inquiry into the legislative history").

The city further argues that allowing a direct action under § 52-557n (b) (7) and (8) would be inconsistent with the legislative protections provided in §§ 7-465,[8]

---

[8]General Statutes § 7-465 provides in relevant part: "(a) Any town, city or borough, notwithstanding any inconsistent provision of law, general, special or local, shall pay on behalf of any employee of such municipality . . . all sums which such employee becomes obligated to

7-101a[9] and 10-235[10] against municipal liability for the reckless acts of employees. We disagree with the city and

pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights or for physical damages to person or property, except as set forth in this section, if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, physical injury or damage was not the result of any wilful or wanton act of such employee in the discharge of such duty. . . ."

[9] General Statutes § 7-101a provides in relevant part: "(a) Each municipality shall protect and save harmless any municipal officer, whether elected or appointed, of any board, committee, council, agency or commission, including any member of a local emergency planning committee appointed from such municipality pursuant to section 22a-601, or any municipal employee, of such municipality from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence, or for alleged infringement of any person's civil rights, on the part of such officer or such employee while acting in the discharge of his duties.

"(b) In addition to the protection provided under subsection (a) of this section, each municipality shall protect and save harmless any such municipal officer or municipal employee from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand or suit instituted against such officer or employee by reason of alleged malicious, wanton or wilful act or ultra vires act, on the part of such officer or employee while acting in the discharge of his duties. In the event such officer or employee has a judgment entered against him for a malicious, wanton or wilful act in a court of law, such municipality shall be reimbursed by such officer or employee for expenses it incurred in providing such defense and shall not be held liable to such officer and employee for any financial loss or expense resulting from such act. . . ."

[10] General Statutes § 10-235 provides in relevant part: "(a) Each board of education shall protect and save harmless any member of such board or any teacher or other employee thereof or any member of its supervisory or administrative staff, and the State Board of Education, the Board of Regents for Higher Education, the board of trustees of each state institution and each state agency which employs any teacher, and the managing board of any public school, as defined in section 10-183b, including the governing council of any charter school, shall protect and save harmless any member of such boards, or any teacher or other employee thereof or any member of its supervisory or administrative staff employed by it, from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence or other act resulting in accidental bodily injury to or death of any person, or in accidental damage to or destruction of property, within or without the school building, or any other acts, including, but not limited to, infringement of any person's

conclude that §§ 7-465, 7-101a and 10-235 can be read to coexist with § 52-557n (b) (7) and (8). Under §§ 7-465, 7-101a and 10-235, a municipal employer is required to indemnify its employees for any judgment rendered against them under certain circumstances. Pursuant to § 52-557n (b) (7) and (8), governmental immunity is abrogated under certain circumstances. Under subsection (b) (7), those circumstances include the issuance, denial, suspension or revocation of any permit or the failure or refusal to issue, deny, suspend or revoke any permit where such failure or refusal constitutes a reckless disregard for health or safety. Under subsection (b) (8), those circumstances include the failure to make an inspection or the making of an inadequate or negligent inspection that constitutes a reckless disregard for health or safety under all the relevant circumstances. Nowhere in the plain language of subdivisions (7) and (8) does the legislature mention or reference §§ 7-465, 7-101a and 10-235. Had the legislature intended to exclude reckless conduct on the part of a municipality or its employees in the issuance of permits or the making of inspections it could have done so. To the contrary, the legislature has specifically abrogated immunity in circumstances in which a municipality's or its employees' conduct in the issuance of permits or the making of inspections constitutes a reckless disregard for health or safety. "It is a well established principle of statutory interpretation that we cannot accomplish a result that is contrary to the intent of the legislature as expressed in the [statute's] plain language. . . . [A] court must construe a statute as written. . . . Courts may not by construction supply omissions . . . . The intent of the legislature, as this court

_____

civil rights, resulting in any injury, which acts are not wanton, reckless or malicious, provided such teacher, member or employee, at the time of the acts resulting in such injury, damage or destruction, was acting in the discharge of his or her duties or within the scope of employment or under the direction of such board of education, the Board of Regents for Higher Education, board of trustees, state agency, department or managing board; provided that the provisions of this section shall not limit or otherwise affect application of section 4-165 concerning immunity from personal liability. . . ."

has repeatedly observed, is to be found not in what the legislature meant to say, but in the meaning of what it did say. . . . In the absence of any indication of the legislature's intent concerning this issue, we cannot engraft language onto the statute. . . . [W]e will not impute to the legislature an intent that is not apparent from unambiguous statutory language in the absence of a compelling reason to do so. Rather, [w]e are bound to interpret legislative intent by referring to what the legislative text contains, not by what it might have contained. . . . It is not the function of the courts to enhance or supplement a statute containing clearly expressed language." (Citation omitted; internal quotation marks omitted.) *McCullough* v. *Swan Engraving, Inc.*, 320 Conn. 299, 309, 130 A.3d 231 (2016).

In *Ugrin* v. *Cheshire*, supra, 307 Conn. 382, our Supreme Court concluded that "§ 52-557n (b) (8) abrogates the traditional common-law doctrine of municipal immunity, now codified by statute, in the two enumerated circumstances [described therein]" and that subsection (b) (8) allows for a direct action against a municipality. For the reasons discussed herein, we are likewise persuaded that this same conclusion applies to subsection (b) (7) of the statute. This court therefore rejects the city's argument that the trial court improperly instructed the jury because, under § 52-557n (b) (7) and (8), a municipality is categorically immune from liability in recklessness when issuing permits or conducting inspections.

2

In the alternative, the city claims that, if this court were to conclude that subdivisions (7) and (8) of § 52-557n (b) authorize a direct action for recklessness against a Connecticut municipality, such cause of action should derive only from a city policy to issue permits or conduct inspections with reckless disregard for health or safety, or a formal citywide practice to recklessly issue permits or conduct inspections that is so pervasive that it was the functional equivalent of city policy. The city relies on *Williams* v. *Housing Authority*, 327 Conn. 338, 174

A.3d 137 (2017), to support this argument. We reject the city's alternative claim.

This court first observes that such a requirement is wholly absent from the plain language in § 52-557n (b)(7) and (8) pertaining to the imposition of liability for recklessness. As we have thoroughly discussed in part I A 1 of this opinion, on the basis of our well established principles of statutory construction, we "will not impute to the legislature an intent that is not apparent from unambiguous statutory language in the absence of a compelling reason to do so. Rather, [w]e are bound to interpret legislative intent by referring to what the legislative text contains, not by what it might have contained. . . . It is not the function of the courts to enhance or supplement a statute containing clearly expressed language." (Internal quotation marks omitted.) *McCullough* v. *Swan Engraving, Inc.*, supra, 320 Conn. 309. The language of § 52-557n (b) (7) and (8) is clear and unambiguous and does not include the requirement of a formal citywide policy or pervasive practice to impose liability on a municipality for recklessness. We decline the city's invitation to engraft such a requirement onto the statute.

In connection with this claim, we also must address the city's misplaced reliance on our Supreme Court's decision in *Williams* v. *Housing Authority*, supra, 327 Conn. 338. In *Williams*, the administratrix of the estates of four residents of a public housing unit that was owned and maintained by the city of Bridgeport brought an action against the fire department and Bridgeport city officials. Id., 341. The plaintiff alleged that the decedents died as a result of the municipal defendants' negligent failure to inspect the smoke detection equipment in their unit, where the fire occurred on November 13, 2009. Id., 341–42. "Pursuant to General Statutes § 29-305 (b), the Bridgeport fire marshal's office [was] required to conduct annual inspections of all multifamily residential units within Bridgeport. It is undisputed that neither the municipal defendants nor their employees conducted the mandatory inspection of [the subject unit] in the

year prior to November 13, 2009." (Footnote omitted.) Id., 342–43.

The plaintiff in *Williams* brought an action and alleged, in part, that the decedents died as a result of the negligent failure of the municipal defendants to inspect the smoke detection equipment in the decedents' unit. Id., 341. The trial court rendered summary judgment in favor of the municipal defendants after concluding that § 52-557n afforded them immunity from liability. Id. Following an appeal from that judgment, this court reversed the judgment of the trial court. Id. Thereafter, our Supreme Court in *Williams* affirmed this court's determination that "a jury reasonably could find that the conduct of the municipal defendants demonstrated a reckless disregard for health or safety under all of the relevant circumstances and, therefore, that they were potentially liable pursuant to § 52-557n (b) (8)." (Internal quotation marks omitted.) Id.,. Our Supreme Court observed that the various submissions presented in connection with the motion for summary judgment "construed in the light most favorable to the plaintiff as the nonmoving party, suggest that, over the course of many years, the municipal defendants maintained a policy of not conducting any routine fire safety inspections of the thousands of public housing units in Bridgeport in the absence of a complaint or request, and also of not routinely inspecting certain of its more than 3000 three-family homes, in violation of their statutory duty under [General Statutes] § 29-305 (b). These policies remained in effect after 2005, despite the fact that the failure to inspect allegedly resulted in multiple fatalities during [an earlier fire that occurred in a three-family residence in Bridgeport in 2005]." (Emphasis omitted; footnote omitted.) Id., 369. Our Supreme Court agreed with this court that, "[i]n light of this factual record . . . a jury, considering all the relevant circumstances, reasonably could find that the municipal defendants' persistent failure to inspect [the decedents' unit] and thousands of others like it both arose from and exemplified a pattern of reckless disregard for public health or safety." Id., 371.

It is important to observe that, although *Williams* was decided based on a record that involved "[the] defendants' long-standing policy of not inspecting any of Bridgeport's public or three-family housing facilities for fire risks and not educating themselves as to the adequacy of the housing authority's own internal inspections"; id., 359; neither the language in the majority's opinion, nor the language in the statute, limit the imposition of liability for recklessness under § 52-557n (b) (8) to cases involving established municipal policies or practices. Rather, in interpreting subsection (b) (8), our Supreme Court in *Williams* focused on "the legislature's use of the modifying phrase 'under *all* the relevant circumstances' . . . [which] suggests that we are to view the exception through a broad lens." (Citation omitted; emphasis in original.) Id., 358. The court then proceeded to list a number of factors, in the context of a failure to inspect, that may be relevant to the determination of recklessness, and which factors are not limited solely to a formal, citywide policy or pervasive practice.[11] Id.

In light of the foregoing, we are not persuaded by the city's argument that liability under § 52-557n (b) (8) must be linked to the existence of a city policy. In our view, the court's reliance on a city policy in *Williams* was the result

---

[11] "In the context of a failure to inspect, it is reasonable to assume that any of the following factors, among others, may be relevant [in determining recklessness under [§ 52-557n (b) (8)]: whether the inspection is mandated by statute or regulation; how frequently inspections are required to be conducted; the nature and severity of the threat to health or safety that the inspection is intended to identify or thwart; whether, and how frequently, threats of that sort have come to pass in the past, either at the location in question or at similar locations; whether the premises involved featured any unique or atypical susceptibilities to risk; the reasons why the inspection was not conducted; whether the failure to inspect was an isolated event or part of a policy or pattern; the number of properties or locations that went without inspection; whether other municipalities or jurisdictions routinely neglect to carry out inspections of the type at issue; the availability and adequacy of alternative means of identifying and thwarting the threats at issue; and whether the municipal officials involved were aware or should have been aware of the answers to each of these questions." *Williams* v. *Housing Authority*, supra, 327 Conn. 358–59.

of the facts before it, not a conclusion that subsection (b) (8) applied only when such a policy exists. Accordingly, we conclude that the city's argument reflects an unduly narrow interpretation of *Williams*.[12]

3

The city next claims that the court erred in charging the jury on general common-law principles of recklessness. Specifically, the city argues that the trial court erred in charging the jury that the standard for recklessness applicable to individuals at common law applies to a municipality when deciding municipal liability under § 52-557n (b) (7) and (8). We are not persuaded by the city's argument.

In determining what constitutes recklessness for purposes of § 52-557n (b) (7) and (8), we are guided, in part, by relevant precedent. In *Williams* v. *Housing Authority*, 159 Conn. App. 679, 124 A.3d 537 (2015), aff'd, 327 Conn. 338, 174 A.3d 137 (2017), this court concluded that "the common-law definition of recklessness [is] instructive for purposes of interpreting the exception for recklessness in § 52-557n (b) (8)."[13] Id., 694. While

_____

[12] We acknowledge that the court in *Williams* was called upon to interpret the language set forth in § 52-557n (b) (8). It viewed that statute, when defining "reckless disregard for health and safety under all the relevant circumstances," through "a broad lens." (Emphasis omitted.) *Williams* v. *Housing Authority*, supra, 327 Conn. 358. As we interpret the language in subsection (b) (7), we nonetheless take guidance from *Williams* as we consider the city's argument that liability under either subsection (b) (7) or (8) depends on the existence of a city policy. Subsection (b) (7), like subsection (b) (8), does not explicitly depend on the existence of, nor refer to, a city policy. Thus, we are not persuaded that subsection (b) (7) requires that a cause of action against a municipality under that subsection of § 52-557n should derive only from a city policy to issue permits with reckless disregard for health or safety, or a formal citywide practice to recklessly issue permits that is so pervasive that it was the functional equivalent of city policy.

[13] In *Williams*, this court looked to common-law jurisprudence for guidance in defining reckless disregard for health and safety under § 52-557n (b) (8). The court stated: "Under Connecticut common law, [r]ecklessness requires *a conscious choice of a course of action* either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable

noting that common-law principles of recklessness are instructive in applying §52-557n (b), in light of the statute's language "reckless disregard for health or safety," our Supreme Court in *Williams* modified these principles with respect to the probability of risk. *Williams* v. *Housing Authority*, supra, 327 Conn. 363–64. The court "recogniz[ed] that the magnitude of a potential risk generally is understood to be the product of the likelihood that [the person's] conduct will injure others [multiplied by] the seriousness of the injury if it happens . . . . It is true that this court, on occasion, has suggested that a defendant is guilty of reckless misconduct only when he knows or should know that there is a high degree of probability that substantial harm will result from his actions. . . . In most instances, however, we have defined recklessness simply as disregarding a high degree or substantial risk of danger, leaving open the question whether it may be reckless to engage in conduct that carries a relatively low likelihood of causing momentous harm. . . . In any event, regardless of what standards govern allegations of recklessness in other contexts, we conclude that, in the context of §52-557n (b) (8), a municipal actor may demonstrate reckless disregard for health or safety when it is clear that the failure to inspect may result in a *catastrophic harm*, *albeit not a likely one*." (Citations omitted; emphasis altered; footnote omitted; internal quotation marks omitted.) Id.

---

[person], and the actor must recognize that his conduct involves a risk substantially greater . . . than that which is necessary to make his conduct negligent. . . . More recently, we have described recklessness as *a state of consciousness with reference to the consequences of one's acts. . . . It is more than negligence, more than gross negligence. . . .* The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . The result is that . . . reckless conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." (Emphasis in original; internal quotation marks omitted.) *Williams* v. *Housing Authority*, supra, 159 Conn. App. 693–94.

It is important to point out that, while affirming that common-law principles of recklessness are instructive in determining what constitutes "a reckless disregard for health and safety" under § 52-557n (b) (7) and (8), our Supreme Court also focused on the language "under all the relevant circumstances" as it appears in § 52-557n (b) (8), which the court determined "suggests we are to view the exception [under subsection (b) (8)] through a broad lens." *Williams* v. *Housing Authority*, supra, 327 Conn. 358. The court considered this language meaningful and not surplusage in light of the omission of similar language in subsection (b) (7). See id. ("[w]e must assume that the legislature's decision to include the 'relevant circumstances' language in subdivision (8), but to omit it from the otherwise identical exclusion provision in subdivision (7), was a purposeful one"). The court then listed a number of factors in the context of a failure to inspect that would be relevant when assessing the recklessness of a municipality's decision not to conduct a health or safety inspection.[14] Id., 358–59. The court ultimately concluded that "the type of conduct that constitutes reckless disregard [for health or safety] for purposes of § 52-557n (b) (8) is more egregious than mere negligence and requires that health and safety inspectors disregard a substantial risk of harm." Id., 366.

More importantly, our Supreme Court in *Williams* noted that "the question of whether the violation of a statutory obligation constitutes reckless disregard for public health or safety for purposes of municipal immunity ordinarily would be one for the trier of fact." Id., 359. "The legislative history of the municipal immunity statute . . . supports . . . the argument that recklessness ordinarily presents a question of fact for the jury . . . . [T]he apparent legislative intent with respect to municipal inspections is consistent with the general rule that, when a defendant's conduct represents more than mere momentary thoughtlessness or inadvertence, whether it rises to the level of reckless or wanton misconduct on any given state of facts [ordinarily] is a question of fact

---

[14] See footnote 11 of this opinion.

for the jury." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Williams* v. *Housing Authority*, supra, 327 Conn. 359–61.

We acknowledge that our Supreme Court in *Williams* did not specifically interpret § 52-557n (b) (7), and that the language "under all the relevant circumstances" contained in subsection (b) (8) was purposefully omitted from subsection (b) (7). See *Williams* v. *Housing Authority*, supra, 327 Conn. 357–58. The present claim, however, requires us to articulate what constitutes "reckless disregard for health or safety" as that language is set forth in 52-557n (b) (7) and as informed by our Supreme Court's decision in *Williams*.

Section 52-557n provides in relevant part: "(b) Notwithstanding the provisions of subsection (a) of this section, a political subdivision of the state or any employee, officer or agent acting within the scope of his employment or official duties shall not be liable for damages to person or property resulting from . . . (7) the issuance, denial, suspension or revocation of, or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authorization, when such authority is a discretionary function by law, unless such issuance, denial, suspension or revocation or such failure or refusal constitutes a reckless disregard for health or safety . . . ." In other words, under § 52-557n (b) (7), a municipality and its employees cannot be held liable for the issuance of a building permit or a certificate of occupancy, provided such authority is a discretionary function by law, unless the issuance of these documents constitutes a "reckless disregard for health or safety."

When interpreting § 52-557n (b) (8), as previously noted, our Supreme Court in *Williams* affirmed this court's conclusion that "the common-law definition of recklessness [is] instructive for purposes of interpreting the exception for recklessness in § 52-557n (b) (8)." *Williams* v. *Housing Authority*, supra, 159 Conn. App. 694; see also *Williams* v. *Housing Authority*, supra, 327 Conn. 362 ("it was not improper for the Appellate Court to look

to the common law for guidance as to the meaning of the term 'reckless disregard' "). Our Supreme Court in *Williams* stated that "the type of conduct that constitutes reckless disregard for purposes of § 52-557n (b) (8) is more egregious than mere negligence and requires that health and safety inspectors disregard a substantial risk of harm." *Williams* v. *Housing Authority*, supra, 327 Conn. 366. Importantly, however, the court determined that "the apparent legislative intent with respect to municipal inspections is consistent with the general rule that, when a defendant's conduct represents more than mere momentary thoughtlessness or inadvertence, whether it rises to the level of reckless or wanton misconduct on any given state of facts [ordinarily] is a question of fact for the jury." (Internal quotation marks omitted.) Id., 361.

Although there is some difference in the statutory language contained in § 52-557n (b) (7) and (8), it stands to reason that the exception in subsection (b) (7), "unless such issuance [of permits or certificates of occupancy] constitutes a reckless disregard for health or safety," should be interpreted similarly to identical language in subsection (b) (8) with respect to inspections. See *In re Jusstice W.*, 308 Conn. 652, 664–65, 65 A.3d 487 (2012) ("[W]here the same words are used in a statute two or more times they will ordinarily be given the same meaning in each instance . . . . Ordinarily, where the legislature uses the same phrase it intends the same meaning." (Citations omitted; internal quotation marks omitted.)). Thus, even though the statutory language varies, in that the language "under all the relevant circumstances" in subsection (b) (8) is not included in subsection (b) (7), the language "reckless disregard for health or safety" is contained in both subdivisions (7) and (8), and, therefore, the analysis in determining what conduct under both subdivisions constitutes a "reckless disregard for health or safety" would not change. We therefore conclude that the type of conduct that constitutes reckless disregard for health and safety for purposes of § 52-557n (b) (7) is more egregious than mere negligence and requires that a municipality or its employee in the issuance of permits

disregard a substantial risk of harm. See *Williams* v. *Housing Authority*, supra, 327 Conn. 366. We further conclude that such determination is an issue of fact for the jury.

With these legal principles in mind, we now review the court's instructions to the jury to determine whether the court appropriately charged the jury on the law applicable to the facts in this case. The court charged the jury with respect to the claims against the city as follows:[15] "I now turn to a discussion of the law of recklessness. The plaintiffs allege claims in recklessness against the city . . . and . . . Schullery. There is a wide difference between reckless behavior and mere negligence. Thoughtlessness and inadvertence are not recklessness.

"Recklessness implies a conscious disregard of a high risk or egregious misconduct that involves an extreme departure from ordinary care in a situation where a high degree of danger is apparent. It connotes a willingness to take high risks without regard to the consequences or to the safety of others.

"To be reckless means that a person must recognize that his actions or omissions involve a risk to others which is substantially greater than that which is necessary to make his conduct negligent.

"Reckless conduct has been defined as outrageous conduct. It requires a conscious choice of a course of action, either with knowledge that it will involve serious danger to others or with knowledge of facts which would disclose this danger to any reasonable person.

"Having reviewed with you the general principles of law applicable to claims in . . . recklessness, I now turn to the specific claims alleged by the plaintiffs against each of the defendants here. "In Connecticut, we have a statute . . . § 52-557n, which allows a plaintiff to assert claims in recklessness against a municipality and municipal employees in certain circumstances.

---

[15] Schullery does not challenge the court's jury instructions. Schullery's claim on appeal is limited to the sufficiency of evidence as to § 52-557n (b) (7) and (8), which we address in part II of this opinion.

"In this case, the plaintiffs alleged that the . . . city . . . issued to the general contractor building permits and a certificate of occupancy in reckless disregard for the public's health and safety, and that it issued these permits and certificates despite knowing that it did not have the required design documents, certifications, and completed testing as required by the building code or in reckless disregard for public health and safety in light of whether they had all the required design documents, certifications, and completed testing.

"The plaintiffs also allege that the city . . . recklessly undertook to conduct and improperly conducted required inspections. More specifically, the plaintiffs allege that the defendant, in violation of the . . . code, did not possess or demand from the involved construction and design professionals proper design plans to proceed with . . . the issuance of building permits or for proceeding with inspections of the roof overbuild, front canopy, foundation, and first floor, the entire pre-engineered building, and the second floor of the project.

"The city . . . denies these claims and maintains that it had all [the] documents required to issue a building permit, to issue a certificate of occupancy, and that it made all inspections required by city officials.

"The plaintiffs also claimed the city . . . recklessly violated Connecticut's municipal records retention requirements . . . requiring municipalities such as the defendant to retain for the life of the structure copies of construction documents as revised depicting the final constructed configuration, as well as [the] certificates of occupancy, inspection reports, permits, and applications for permits.

"The plaintiffs claim that the city . . . violated these requirements by failing to retain and/or by destroying the construction documents it had on file, and that there is foreseeable catastrophic harm to one or more individuals from not having the complete and correct final constructed plans on record for the life of the structure.

The city . . . also denies these claims and asserts that it did not purposefully destroy or fail to retain any documents. . . .

"[The] defendants, such as the city . . . act[ed] in reckless disregard for health or safety when it is clear that its failure to comply with the state building code may result in catastrophic harm, even if that harm is not likely. Catastrophic harm to a member of the public does not mean a catastrophic collapse of the building or a collapse of the floor.

"Our law provides for the imposition of liability when a municipality's failure to inspect constitutes a reckless disregard for health and safety under all the relevant circumstances. Therefore, you must consider all the relevant facts presented to you during the course of this trial to make a determination as to whether the actions of the municipal defendant constituted a reckless disregard for health and safety when it conducted an inspection required under the building code.

"In considering whether the plaintiffs have proven that the city . . . was reckless under all the relevant circumstances, I am going to review with you certain legal standards that the plaintiffs claim were violated by the city . . . in connection with the project at issue.

"The building code has been incorporated into our law by statute. The purpose of the building code is to establish the minimum requirements to safeguard the public health, safety, and general welfare through structural strength, means of egress, and stability. The building code exists to protect the health and safety of the public, and it has specific requirements about which there has been fact and expert testimony.

"The building code requires municipal officials to issue permits and conduct inspections only upon receipt and approval of proper documentation. The plaintiffs claim that the city . . . was reckless in issuing permits for and conducting inspections of the plaintiffs' building without first receiving all the design plans and special inspections

reports required by the building code.

"In addition, there has been testimony about whether certain records were missing from the building department files and whether the defendant issued a certificate of occupancy without having obtained required documentation.

"The city denies these claims and maintains that it had all the documents required to issue a building permit, to issue a certificate of occupancy, and that it made all inspections required by city officials.

"[The city] further asserts that it did not purposefully destroy or fail to retain any documents. In addition, one of the applicable codes that may be considered by you in assessing the totality of the circumstances is the [Danbury city code] which governs actions constituting unfaithfulness to public office. . . .

"[That section] provides [that] no city officer or employee shall grant any special consideration, treatment, or advantage to any other citizen beyond that which is available to every other citizen.

"The requirements of the Connecticut building code also govern the party's conduct, and . . . are to be considered by you in . . . assessing the plaintiffs' recklessness claims." The court then instructed the jury with respect to various sections of the code that pertained to (1) minimum live load requirements, (2) requirements that buildings be designed for the maximum loads expected by their intended use or occupancy, (3) requirements for structural safety taking into account the way it is designed and the way it is constructed, and (4) minimum standards for concrete slabs like the one located on the second floor of the pre-engineered building at issue in this case.

The court then instructed: "With respect to required inspections, the city does not have to have actual notice of a hazard or condition in order to be reckless with regard to inspecting it. Nor does the city need to have actual

notice of all deficiencies and require documentation to be reckless in issuing building permits or a certificate of occupancy.

"However, city building officials are entitled to rely on the accuracy of special inspection reports. The city has an obligation under the building code to examine the construction documents submitted for a building permit and to ascertain by such examinations whether the construction indicated is in accordance with the requirements of the code and other pertinent laws or ordinances.

"The city also has a statutory obligation to obtain statements of professional opinion from the architect or engineer of record and the contractor prior to issuing any certificate of occupancy.

"Those statements of professional opinion each had to affirm that the completed structure or addition is in substantial compliance with the approved plans and specifications on file with such building official.

"**[**General Statutes**]** § 29-276 (c)**,** in deciding whether the city acted recklessly, you may consider whether the city obtained all required statements of professional opinion prior to issuing the certificate of occupancy.

"Where several acts of recklessness are the cause of the damages alleged, the plaintiffs may allege all of the specific acts of recklessness as the cause of the damages sustained. Proof of any one of these specific acts is sufficient to sustain the plaintiffs' burden of proving that the city acted recklessly. In order for the plaintiffs to prevail, they must prove by a preponderance of the evidence that, one, the . . . city's officials engaged in conduct constituting a reckless disregard for health and safety, and two, this reckless conduct caused the damages claimed by the plaintiffs. If the plaintiffs fail to prove either element, you must return a verdict for the city . . . .

"You have heard both facts . . . and expert witness testimony on these allegations and the city's denial of the plaintiffs' claims of recklessness. And you must determine whether or not the plaintiffs have carried their burden of proof on some or all of their allegations.

"If you find that the plaintiffs have proven each required element of recklessness, you will find liability in favor of the plaintiffs, fill out the appropriate plaintiffs' verdict form for recklessness, and award damages in accordance with the instructions I will give you on the law of damages later on in this jury charge."

Previously, in this opinion, we set forth the principles that govern our review of jury instructions. The claim is that the court failed to convey the proper legal standard for recklessness under subsection (b) (7) and (8) of § 52-557n. We reject the city's argument that the court did not adequately instruct the jury with respect to the standard of recklessness that applies to subsection (b) (8). The city has failed to demonstrate that the court misled the jury with respect to the allegations of recklessness or the proper legal standard as derived from the plain language of subsection (b) (8) and our Supreme Court's discussion of the recklessness requirement in *Williams*. Importantly, the court unambiguously instructed the jury that, in the context of § 52-557n (b) (8), a municipal actor may demonstrate reckless disregard for health or safety when it is clear that the failure to comply with the building code in terms of issuing permits or conducting inspections may result in a catastrophic harm, albeit not a likely one.

The court followed *Williams* v. *Housing Authority*, supra, 327 Conn. 338, in terms of describing the standard of recklessness that applies to a failure to inspect under subsection (b) (8) of § 52-557n. The court did not set forth a different standard of recklessness that applies to the issuance of permits under subsection (b) (7) of § 52-557n. As we explained earlier, however, although our Supreme Court held that the exception under subsection (b) (8) is to be viewed "through a broad lens";

*Williams* v. *Housing Authority*, supra, 327 Conn. 358; both subdivisions (7) and (8) of § 52-557n (b) have in common the same requirement, namely, that the issuance of a permit or the failure to make an inspection constitutes a "reckless disregard for health or safety." Thus, to the extent that the court explained common-law principles of recklessness to the jury, it properly guided the jury in determining the issues before it. To the extent that the court went beyond those common-law principles by referring to the *more broad* definition under subsection (b)(8) pursuant to *Williams* v. *Housing Authority*, supra, 327 Conn. 330, this court, when reviewing the court's instruction in its entirety, and when read as a whole, cannot conclude that the instruction misled the jury. We are mindful that, "[w]hen reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Instructions are adequate if they give the jury a clear understanding of the issues and proper guidance in determining those issues." (Citation omitted; internal quotation marks omitted.) *Smith* v. *Greenwich*, 278 Conn. 428, 437, 899 A.2d 563 (2006). Accordingly, we reject the city's argument.

B

Following the jury verdict, the city moved to set aside the verdict and for judgment notwithstanding the verdict, renewing arguments made in a previous motion it brought for a directed verdict.[16] In its motion, the city

---

[16] Schullery filed a similar postverdict motion, which we address in part II of this opinion.

argued, inter alia, that insufficient evidence was introduced to support a finding that the defendants acted in reckless disregard for health and safety, as provided by § 52-557n (b) (7) and (8). On appeal, the city claims that the trial court abused its discretion by not setting aside the verdict against the city because there was insufficient evidence on which a jury could base a finding of reckless disregard for health or safety under § 52-557n (b) (7) and (8). We disagree.

In its memorandum of decision denying the defendants' various postverdict motions, including the city's motion to set aside the verdict and for judgment notwithstanding the verdict, the court concluded that "[m]ore than sufficient evidence—both testimonial and documentary, fact and expert—was introduced to support the jury's conclusion that the defendants acted in reckless disregard for health and safety in connection with the subject property."

We begin by setting forth our standard of review. "Appellate review of a trial court's refusal to render judgment notwithstanding the verdict occurs within carefully defined parameters." (Internal quotation marks omitted.) *Rossova* v. *Charter Communications, LLC*, 211 Conn. App. 676, 682–83, 273 A.3d 697 (2022). "The standard for appellate review of the denial of a motion for judgment notwithstanding the verdict is well settled and mirrors the standard applicable to a motion for a directed verdict. Directed verdicts are not favored. . . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision [to deny the defendant's motion for a directed verdict] we must consider the evidence in the light most favorable to the plaintiff. . . . Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party. .

. . The foregoing standard of review also governs the trial court's denial of the defendant's motion for judgment notwithstanding the verdict because that motion is not a new motion, but [is] the renewal of [the previous] motion for a directed verdict." (Internal quotation marks omitted.) *Cockayne* v. *Bristol Hospital, Inc.*, 210 Conn. App. 450, 458, 270 A.3d 713, cert. denied, 343 Conn. 906, 272 A.3d 1128 (2022). "Whether the evidence presented by the plaintiff was sufficient to withstand a motion for [judgment notwithstanding the verdict] is a question of law, over which our review is plenary. . . .

"Two further fundamental points bear emphasis. First, the plaintiff in a civil matter is not required to prove [her] case beyond a reasonable doubt; a mere preponderance of the evidence is sufficient. Second, the well established standards compelling great deference to the historical function of the jury find their roots in the constitutional right to a trial by jury." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Rossova* v. *Charter Communications, LLC*, supra, 211 Conn. App. 683–84.

"The standard of review governing our review of a trial court's denial of a motion to set aside the verdict is well settled. The trial court possesses inherent power to set aside a jury verdict [that], in the court's opinion, is against the law or the evidence. . . . [The trial court] should not set aside a verdict [when] it is apparent that there was some evidence [on] which the jury might reasonably reach [its] conclusion, and should not refuse to set it aside [when] the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles." (Internal quotation marks omitted.) *Weyant* v. *Kristy*, 126 Conn. App. 180, 183, 10 A.3d 119 (2011). "Our standards of review for the denial of a motion for a directed verdict and denial of a motion to set aside a verdict are the same." *Hall* v. *Winfrey*, 27 Conn. App. 154, 157, 604 A.2d 1334, cert. denied, 222 Conn. 903, 606 A.2d 1327 (1992). Our Supreme Court has stated

that "[w]hether the evidence presented by the plaintiff is sufficient to withstand a motion for a directed verdict is a question of law, over which our review is plenary." (Internal quotation marks omitted.) *Farrell* v. *Johnson & Johnson*, 335 Conn. 398, 416–17, 238 A.3d 698 (2020); see also *MacDermid, Inc.* v. *Leonetti*, 328 Conn. 726, 744, 183 A.3d 611 (2018) (same).

Having set forth the applicable standard of review, we now turn to the allegations of recklessness made by the plaintiffs against the city, the evidence submitted in support of those claims, and whether there was sufficient evidence from which the jury could conclude that the city acted in reckless disregard for health and safety in the issuance of permits and in conducting inspections regarding the subject construction project.

In count one of their third amended complaint, the plaintiffs alleged under § 52-557n (b) (7) that the city was reckless in connection with the issuance of building permits and the issuance of a certificate of occupancy because the written materials submitted to the city to obtain such permits and certificates failed to meet the requirements of the code. Specifically, the plaintiffs alleged that the city "acted in reckless disregard for the health or safety of the plaintiffs and their employees, persons performing work on the project, and other persons entering the property, concerning violations of the building code of which they knew or should have known, including but not limited to the following:

"[(1)] Recklessly failed to properly require the timely and complete filing of permit application documents (including complete drawings, specifications and other supporting information) prior to the issuance of any permits, in violation of their ministerial duties.

"[(2)] Recklessly issued a foundation permit when the design of the foundation was incomplete and not coordinated with the design of the structure above the foundation.

"**[(3)]** Recklessly issued a building permit when the design for the entire building was incomplete.

"**[(4)]** Recklessly failed to require the filing of adequate construction documents prior to performance of construction work, including but not limited to documentation for the front foundation wall, the sloped roof, the front canopy, internal stairs, structural concrete slabs, deck and joist components, and elements of the exterior facade.

"**[(5)]** Negligently or recklessly failed to inspect properly work during construction (and conducted inspections with inaccurate and incomplete documentation), including but not limited to the front foundation wall, the entire foundation structure, the first floor slab, the second floor slab, deck and joist components, roof framing above the existing building roof, the sloped roof, the front canopy, internal stairs, and elements of the exterior facade.

"**[(6)]** Recklessly issued a certificate of occupancy when inspections had not been performed properly, when the required construction documentation was incomplete, and when [the] work in place obviously did not conform with the partial construction documentation that had been filed.

"**[(7)]** Negligently or recklessly failed and refused to investigate fully and timely numerous instances of noncompliance with the building code when informed of the noncompliance.

"**[(8)]** Negligently or recklessly stated that the building was constructed properly when in fact it had not been so constructed.

"**[(9)]** Recklessly withheld from the plaintiffs during arbitration proceedings to the prejudice of the plaintiffs an evaluation by a city-retained engineer that confirmed the existence of building code violations and defective design and construction on the project.

"**[(10)]** Recklessly submitted documentation and testimony during arbitration proceedings to the prejudice of the plaintiffs containing false information regarding the compliance or noncompliance of the project with the building code, zoning requirements and engineering requirements for the project.

**[(11)]** Recklessly failed to administer the building code of the state of Connecticut . . . ."

In count two of their third amended complaint, the plaintiffs alleged under §52-557n (b) (8) that the city was reckless in conducting inspections or failing to conduct inspections "under all the relevant circumstances concerning violations of the building code of which they knew or should have known, including, but not limited to, the following:

"**[(1)]** Negligently or recklessly failed to inspect properly work during construction (and conducted inspections with inaccurate and incomplete documentation), including but not limited to the front foundation wall, the entire foundation structure, the first floor slab, the second floor slab, deck and joist components, roof framing above the existing building roof, the sloped roof, the front canopy, internal stairs, and elements of the exterior facade.

"**[(2)]** Negligently or recklessly failed and refused to investigate fully and timely numerous instances of noncompliance with the building code when informed of the noncompliance.

"**[(3)]** Negligently or recklessly withheld information and an evaluation by a city retained engineer that confirmed the existence of building code violations and defective design and construction on the project.

"**[(4)]** Recklessly submitted documentation and testimony during arbitration proceedings to the prejudice of the plaintiffs containing false information regarding the compliance or noncompliance of the project with the

building code, zoning requirements and engineering requirements for the project.

"**[(5)]** Recklessly failed to administer the building code of the state of Connecticut . . . ."

The plaintiffs presented voluminous evidence that, during the permitting phase of the project, there were deficiencies, sometimes obvious in nature, with respect to the submissions that had been presented to the city concerning the project and that the city had not received documents required by the building code prior to issuing permits. Specifically, the plaintiffs presented evidence that, although the original structure and the proposed additional structure were two different building types, the architectural plans submitted to the city did not properly account for fire protection in terms of construction type or the use of a firewall. Additionally, incompatible structural drawings had been submitted to the city on behalf of the plaintiffs, and they did not address all of the necessary structural aspects of the project. Moreover, the plaintiffs presented evidence that, at the time the permit was issued, the submissions before the city, including newer building plans from Michael Horton Associates, Inc. (Horton), a structural engineer, did not include foundation footing designs for the entire front wall of the building under canopies, designs for the canopy roof or barrel vaults, or designs to address the load path linking the foundation to the gravity and seismic loads of the pre-engineered building above.

The plaintiffs also presented evidence that, after a change in engineering plans occurred, there was insufficient documentation submitted to the city that the new plans adequately took into consideration the unique needs of the project, which linked an existing building to a pre-engineered structure. On October 4, 2007, prior to the city's issuance of the building permit, Richard Marnicki, a structural engineer who had submitted design plans in connection with the permit application, provided written notice to Null, the city's chief building inspector, that, in light of the fact that the structure

that he designed was being "redone" by another structural engineer, "the structural drawings that were filed for a building permit . . . are not to be considered. The entire design of the new building and existing building reinforcements are being done by someone else. Please destroy the structural drawings prepared by my office as they are no longer valid. Also, please remove the special inspection form also submitted with the building permit application. The structural design of this project is by others and their signed and sealed drawings will govern the building design." The newer plans submitted by Horton were inconsistent with Marnicki's plans. The plaintiff presented evidence that city building officials failed to inquire with respect to the adequacy of the new plans when they made no mention of the entirety of the structure that was planned to sit above the deck of the addition.

Milton Gregory Grew, a licensed architect and a licensed building official, reviewed the record of what occurred during the permitting phase of the project. Grew testified that, "[i]f the drawings [by Horton] were going to be submitted to supersede [the drawings by Marnicki], then there would've been documentation that would've clearly indicated all of Marnicki's drawings should no longer be considered part of this project. We now have [Horton] drawings for not just the foundation, but also, if no one is going to design the second floor structural slab then the second floor as well. Also, the work over the existing building, the structural enhancements that were being done there. And then, someone would have to take responsibility for coordinating the Varco Pruden . . . pre-engineered metal building design with the [Horton] design and coordinate with the [architects]. All of this, the building department could have easily foreseen this whole thing to kind of come apart and not be coordinated. Therefore, some big issues fall through the cracks if they had just simply stopped it a couple times and had the team get their act together." Grew further opined that "I don't believe we'd be here talking about it today if the proper process had been followed."

Relying on the submissions in the city's possession, Grew opined that Schullery did not act in accordance with the building code and, in fact, acted in a "reckless fashion." Grew explained: "[A]s a building official performing a review of the construction documents for a permit, if I am seeing things on the drawings that are clear basic violations of the building code, and then also going out into the field and seeing things that are clear violation[s] of the process that's in the building code, if I am making a decision to ignore those things or let those things pass, there is a foreseeable eventuality that somebody might get hurt from that. Especially, we are talking about fire resistance and structural matters. That's the building staying up and providing life safety for humans. And, so, if I'm making decisions to ignore certain things, or not comment on them, or not stop the process to get them corrected, that is being reckless. I can foresee, it may not happen, but I can foresee a bad eventuality, a bad outcome to people because of that decision. . . .

"[A]s I've described earlier, there are basic steps that are outlined in the building code that any building official must follow in his examination of the documents, in doing his plan review to make sure that the design professionals have fulfilled the minimum requirements in the building code, and there are clearly basic areas where this was ignored or not done including something as major as the construction of a 10,000 square foot second floor without a drawing just on what was testified to by Mr. Schullery, sort of a verbal say-so of how that floor was to be built and hope that it holds up [the way] it's supposed to hold up. So, to me, that whole process ignored basic building code provisions that any building official, assistant building official, inspector, should have known."

A central part of the plaintiffs' evidence with respect to the permitting stage of the project focused on the fact that city officials had relied on drawings made by Varco Pruden, the manufacturer and engineer of record for the pre-engineered building. The plaintiffs presented

evidence that the drawings, which were approved by the city, were meant to be preliminary, and they plainly were not applicable in the present case in which the pre-engineered building, which was designed to be a free-standing structure, was to be attached to the existing structure. As Grew testified, Varco Pruden "[is] designing their structure and assuming that it's a stand-alone free standing building with nothing around it, including no adjacent building. So, they are not treating this building or considering it to actually be an addition to another building." Additionally, the plaintiff presented evidence that the design proposals submitted to the city reflected that the support system to hold up the planned concrete floor was plainly inadequate. Grew testified that, if the project was built according to the design plans submitted to the city, which reflected a lack of adequate joist support, "this floor would collapse."

We next turn to the phase of the project during which the code mandated that certain inspections occur. In basic terms, the plaintiffs presented evidence that, pursuant to the building code, once a building permit has been issued by the appropriate authority, as had occurred in the present case, inspections are required at different phases of construction. Pursuant to the code, the municipal building inspector conducts certain inspections and, in projects like the present project, in which special inspections are also required, more detailed inspections of certain facets of construction must also occur. Grew opined that he had reviewed the city's records with respect to the required inspections under the code in the present case. With respect to whether city building officials complied with their duty to inspect certain areas of construction, including the second floor slab, the roof and overbuild area, the canopy roof barrel vaults, the dormers, and the structure where the dormers were attached to the particular type of sheathing material used in the overbuild area of the structure (densglass), Grew stated that "the building department did not comply with the requirements of the . . . code to conduct their inspections. That they did not make the decisions that they should have

made to stop work in [certain] areas, to require that there be submitted drawing[s] [by] . . . their [architect] or engineer sealed by the respective design professionals. That, then, the work proceed [only] after those revised drawings or submitted drawings have been submitted to the city. That doing anything short of that, such as allowing the condition to continue to exist, was reckless."

Grew further testified: "I could foresee that allowing construction to continue or not by getting things corrected could . . . result in something catastrophic happening, whether it's a high load going through the first floor or it's winds pulling those dormers on the façade of the building off, or it's even a fire. I now have this light frame, combustible wood obstruction in the building, where on the building's own records, they're calling the building noncombustible.

"So, if I'm a firefighter, the records that I have say its noncombustible and I've got highly combustible materials in that building. So, even for firefighters in the future going there, they aren't going to know that there's improper non-fire-retardant sheathing over the front canopy of the building. They're not going to know that there's light wood framing over the trolley barn. And so, they could easily go up in those areas and maybe be subjected to construction failing a lot faster under fire than they would expect because city records say the building's noncombustible. . . .

"There are foreseeable catastrophes or bodily harm that could occur simply because as a building official, I didn't do my job. . . .

"As a building official, I'm charged with following rules so that this doesn't happen. So, my not following the code and the regulations allows a window for a catastrophe to happen. . . .

"I think we've certainly seen evidence. With so many gaps in the design of this building and the inspections, that under an earthquake event, a real fire event, a real emergency or hurricane, it's very possible that this

building could fail far sooner than one would expect it to. Or reasonably expect . . . it to because of the way the design should have been."

The plaintiffs presented evidence that, in certain aspects of the construction, including welding, bolting, steel frame bracing, and connections, the city building officials failed to ensure that the inspection process was followed and that the required special inspections under the code were conducted, with the results of those inspections being put in the building file. Grew testified that "[t]here is a final report that's required to do a summation of all the reports that have been done, that they are complete and that any deficiencies found in the course of doing special inspections have all been corrected at this point."

Grew testified that, with respect to his opinion as to whether the city building officials fulfilled their obligations under the building code for the handling of special inspections of the project, "it's clear that the building department did not fulfill their duties at all with respect to [what the] building code required. The safety factors that go into the structure and life safety of this building. That they issued a certificate of occupancy without having the special inspections or knowing that the building had been completed in a structurally compliant manner. That's reckless because the foreseeable eventuality or possibility of them not acting properly is possible to harm someone."

Grew continued: "[B]ecause the building official made decisions to not have all of the special inspections executed and to not have them all culminated by the time he issued a statement of special inspections. It is very possible that this building, certain aspects of it, certain parts could fail prematurely due to some event and cause harm to individuals. Just one small example is . . . [the] after-the-fact inspections done on the welding of the stairs. Well, the stairs are a means of egress. They're the exit to get out of the building in the event of an emergency.

"And so, we do not want to have welds, connections for the stair stringers that support those stairs or for the railings that keep the occupants safely going down the stairs failing inspection? No. Is it possible that those could fail under an emergency situation? It is. Could they fail prematurely? Certainly, it's possible because they don't meet the building code requirements."

The plaintiffs presented evidence that a building official was required to inspect the preparations for the deck and the reinforcements for the deck prior to the time that concrete was poured on the second floor of the structure. The plaintiffs presented evidence concerning a specific inspection that occurred on March 11, 2008, by Schullery, with respect to the second floor of the structure, prior to the pouring of concrete. The evidence demonstrated that Schullery did not have a current engineering design on file pertaining to the floor slab and the manner in which the floor system would be constructed. Instead, he was in possession of an outdated drawing made by Marnicki. Schullery testified that an inspection of the second floor deck was required by the code. When he arrived at the job site on the date of the inspection, he observed a work crew installing framing and walking across concrete mesh installed on the deck. Schullery recalled that, because the drawings on file did not detail the second floor, he asked the on-site supervisor from Rizzo if he could show him a plan for how the deck slab was supposed to be laid out and poured. Schullery testified that the supervisor from Rizzo "told me that they contacted the engineer, and that they were going to utilize the first floor design from [the structural engineer] Horton as a second floor application." Although Schullery testified that the building department was not in possession of alternative design plans, he was aware that the Marnicki designs were no longer to be used.

Grew testified that, in accordance with code standards, "if [Schullery] felt that the Marnicki drawing was no longer applicable to the project and construction personnel out there, supervisors are representing to him that it's

not and they have some other plan or method of building it from another engineer, well, you say fine, stop here, get that engineer to design it, and submit to me a drawing that's signed and sealed . . . that shows me how that second floor will be built and then you can proceed. But, stop here until we get that." Grew, referring to the evidence that a contractor told Schullery at the time of the inspection that Horton's plan for the concrete placement of the first floor of the structure was to be used for the second floor as well, opined that Schullery's reliance on this representation was "[a]bsolutely not" in accordance with inspection standards set forth by the code and that Schullery "should have stopped the process. It should have been a failed inspection, or say get me a new design from an engineer, signed and sealed, and we'll see you another time." Although the city relies on "undisputed evidence that [it] conducted over 100 inspections during the construction phase of the subject project," the aforementioned evidence demonstrates that, although inspections occurred, according to Grew, not all of them were adequate under the code.

Finally, we turn to the phase of the project during which the city issued a certificate of occupancy for the plaintiffs' building. The plaintiffs presented evidence that a certificate of occupancy should not be issued until such time as the architect or professional engineer of record, as well as the general contractor, has submitted a professional opinion letter certifying that the completed structure is in substantial compliance with the approved plans and specifications filed with the building department. This is mandated by the applicable statute.[17] The

[17]General Statutes § 29-276c provides in relevant part: "(a) . . . [T]he plans and specifications for [a] structure or addition shall be sealed by the licensed architect of record or professional engineer of record responsible for the design of the structure or addition. Such architect or engineer of record shall be retained and be responsible for the review of the implementation of the design of such structure or addition including the review of shop drawings and the observation of construction. . . . If fabricated structural load-bearing members or assemblies are used in such construction, the licensed professional engineer responsible for the design of such members or assemblies shall be responsible for the

plaintiffs presented evidence that, in July, 2008, prior to the issuance of the certificate of occupancy, Schullery was well aware that he lacked documentation, including inspection reports and up-to-date design plans, that were necessary to issuing the certificate of occupancy.[18] Grew testified that a certificate of occupancy should not have been issued in this case because of a fundamental problem, namely, that the building officials were unable to verify that the completed structure was in compliance with approved plans and specifications on file with the building department. Grew also testified that the issuance of a certificate of occupancy demonstrated a reckless disregard for public safety: "[P]roblems, failures, things that could cause harm to individuals, people occupying or visiting this building is probable, based on [the] building not being code compliant and a building official having issued a certificate of occupancy recklessly without knowing that the building was code compliant." Grew testified that the certificate of occupancy, issued on November 3, 2008, did not comply with the code in that it was issued in the absence of necessary documentation and with errors in the documentation put before the building

implementation of said engineer's design by reviewing the fabrication process to ensure conformance with said engineer's design specifications and parameters.

"(b) Prior to the issuance of a certificate of occupancy for a proposed structure . . . the local building official shall require a statement signed by the architect of record or the professional engineer of record responsible for the design of the structure or addition or the additional architect or professional engineer retained pursuant to subsection (a) of this section, and by the general contractor involved in the construction of such structure or addition affirming their professional opinion that the completed structure or addition is in substantial compliance with the approved plans and specifications on file with such building official. . . ."

[18]The plaintiffs offered, and the court admitted into evidence, a letter, dated July 25, 2008, from Schullery to John Girolametti stating in relevant part: "As of this date, the City of Danbury Building Department has yet to receive any revisions to the approved plans on file. Additionally, this department has not received the required special inspection reports for your project.

"A statement of professional opinion signed by the architect, engineer, and the general contractor stating that the completed structure or addition is in substantial compliance with the approved plans on file is also required."

department. The documentation reflected an incorrect construction type and an incorrect occupancy type. The documentation failed to reflect the fact that there were two different construction types used in the building, with no firewall between them. Also, the building was not properly documented as a wood frame building in light of the wood studs and joists used, as well as the sheathing type used over the canopy in the front of the building. Grew also testified that these errors could lead to a foreseeable risk of "bad things" happening in the future. He testified: "In Connecticut, the definition of an existing building is the one that has a certificate of occupancy and, as we saw according to [the] statement of retention records, you have to keep both of those documents for the life of the building, along with the approved drawings that are on file. Those are to be a record for anybody that's doing anything or has anything to do with that building going forward as long as that building is standing. The fact that this says business occupancy . . . [means] it would not be required to have sprinklers.

"So . . . somebody in the future [could] take the sprinklers out of there when they should be there because it's the wrong occupancy classification . . . . So, a certificate of occupancy is critical to going forward [with respect to] anything that's going to take place with the building. If all we have are people [who] remember . . . [that the structure was built for] retail or [who] remember it was [built for] storage, and it hasn't been properly documented, what else could fall through the cracks with respect to this building that has to do with life safety?"

Grew continued: "Well, the probability is that sprinklers or the fire alarm system could be legally disabled because it's got the improper occupancy classification. The other problem too is these records are normally shared with other departments. So, the fire department . . . coming up with their action for how they're going to fight a fire [at the structure]. Oh, well it's [described as] a noncombustible building. Well, that might be one way that they're going to fight it, but if they knew they

[actually] had light frame wood construction in portions of the building, that would give them pause and make them say, well, there's portions of this building that are going to collapse a lot faster than what I would expect to happen under a fire situation with a noncombustible building. . . . Noncombustible means it doesn't burn, so that becomes a catastrophic problem, too. You can foresee a firefighter, or a member of the public, being injured sooner under a fire situation because there's wood frame construction that was allowed to take place and we're going to hide it by calling it a noncombustible building [on the certificate of occupancy]." Grew stated that, because of the inaccuracies on the certificate of occupancy, "[firefighters are] not going to have the information they need . . . in order to safely fight a fire. It really could pose a risk to safety."

The city argues that, prior to the issuance of the certificate of occupancy, the general contractor, Rizzo, confirmed by letter "that *all* parts of the drawings and project manual and *all* portions of the work were reviewed, and that *all* work was completed and ready for final inspection." (Emphasis in original.) This evidence, however, did not amount to what was required by law, namely, a certification in accordance with General Statutes § 29-276c (b) that the work on the structure had been completed in accordance with the plans on file with the building department.[19] Moreover, the plaintiffs demonstrated that the building department also lacked required professional opinion letters from the engineers of record[20] for each of the distinct structural aspects

[19] Instead, Anthony M. Curcio, the vice president of the general contractor, Rizzo, filed a "Project Completion Notice," dated October 10, 2008, with the building department. In that notice, Curcio certified that, "in accordance with the contract agreement dated November 2, 2007 . . . all punch list corrections have been completed and . . . all work is completed and ready for final inspection and Owner's acceptance."

[20] The plaintiffs presented evidence that there were three engineers of record in connection with the project, one that was responsible for the foundation, one that was responsible for the canopy design in the front of the building, and a third that was responsible for the pre-engineered steel structure built on top of the foundation.

of the project with reference to the plans on file in the building department. The city argues that it was proper under the code for building officials to deal with only one design professional, Horton. Even if we agreed with that proposition, it is clear that Horton did not consider itself responsible for the pre-engineered building designed by Varco Pruden, and, thus, there was no basis on which the city properly relied on any representations made by that firm with regard to the pre-engineered structure.[21] The city issued the certificate of occupancy in the absence of any of the necessary certifications from Varco Pruden.

Grew opined that, on the basis of his experience and training, as well as his review of the record in this case, "the building official, the assistant building official, the building department as a whole did not at all comply with

[21] There was a "substantial completion" letter in evidence from Horton, the engineer of record for the foundation upon which the pre-engineered steel addition rested, to Rizzo, dated September 15, 2008. The letter stated that "the new additions and renovations to the [building] have been constructed in substantial compliance with our [d]rawings and [s]pecifications. During the course of construction we performed review of shop drawings, limited site inspections and construction administration consultation. Special inspections and testing services were provided by others. We did not provide full time inspection or observations." The letter from Horton also stated that its role as engineer of record was limited to "the foundations and first floor framing for the pre-engineered metal building addition" as well as "renovations to the existing structure." The letter stated that "[t]he Engineer of Record for the pre-engineered metal building was the manufacturer, Varco Pruden." There was no evidence that a statement of professional opinion had been filed by either Horton or Varco Pruden with respect to the pre-engineered building.

As Grew testified, the letter from Horton failed to meet the correct standard in many ways. First, the letter did not state that work had been completed in compliance with drawings and specifications on file with the building department. Second, the letter makes clear that special inspections were performed by others. Third, the letter made clear that Horton did not supervise the construction. Grew also testified that it was clear from the letter that Horton was not taking responsibility for the steel building that was supplied by Varco Pruden. According to Grew, that portion of the letter was a clear impediment to issuing a certificate of occupancy and such a certificate should not have been issued in the absence of more information about the structure manufactured by Varco Pruden.

the requirements of the building code or state statutes prior to the certificate of occupancy [being issued] and had no legal basis upon which to issue the certificate of occupancy." Grew opined that issuing a certificate of occupancy in this case, without prior code compliant action on the part of the building department, was "reckless because it was certifying [the building] as complying with the building code. A building upon which there was insufficient inspections, insufficient signed and sealed design drawings, and no way for the building official to know with assurance that building wouldn't fail prematurely or other failure that could harm individuals, based on its lack of code compliance."

The plaintiffs also focused on the fact that the unique circumstances of the Party Depot building, which combined an existing structure with a new pre-engineered metal structure, required certification that accounted for how these very different structures interacted. The city argued that it was sufficient for building officials to rely on the structural engineering drawings for the pre-engineered part of the building from Varco Pruden. The plaintiffs presented evidence, however, that these drawings failed to account for the ways in which the pre-engineered building interacted with the existing structure. Grew testified that "problems, failures, things that could cause harm to individuals, people occupying or visiting this building is probable, based on [the] building not being code compliant and a building official having issued a certificate of occupancy recklessly without knowing that the building was code compliant. So, something as simple as . . . the boilerplate language on the Varco Pruden drawings that said 'we're designing this [pre-engineered steel] building as if there's nothing around it.' Then, we hear testimony that, because of the seismic loads on this building, that there's a draft of upwards of twelve inches on this building. Well, it is built [according] to the details and architectural drawings right smack into and right notched into the existing unreinforced mason trolley barn. Well, that's a problem. That was something foreseeable by the building department because they

were told on the Varco Pruden drawings that . . . there [is not] to be anything else next to [the Varco Pruden steel structure], so they're not going to account for that. They're not going to account for the interaction between two different structures in the event of a seismic or high wind event."

Having considered the evidence in the light most favorable to the plaintiffs, we conclude that there was sufficient evidence from which the jury could reasonably and legally conclude that the defendants acted in reckless disregard for health and safety, as provided by § 52-557n (b) (7) and (8). Accordingly, the city has failed to demonstrate that the court erred in denying its motion to set aside the verdict and for judgment notwithstanding the verdict.

C

The city's final claim is that the court abused its discretion when it declined to order a remittitur as to the damages assessed against the city in the amount of a presuit settlement that was reached between the plaintiffs and Larrabee , the plaintiffs' architect. It is undisputed that, pursuant to the settlement, the plaintiffs received $280,000. We agree with the city that the court erred in denying its motion for remittitur filed in each of the underlying civil actions.

Following the jury's verdict, the city filed a motion for remittitur in the amount of $280,000 "because the amount awarded by the jury was excessive as a matter of law." In its memorandum of law in support of the motion, the city argued[22] that there was evidence presented at trial that the full extent of the plaintiffs' damages was $16,655,826.44 and that, by the admission of

[22] In its motion for remittitur, the city argued that the court should also reduce the verdict against it by $10,566,982 on the ground that the testimony of the plaintiff's expert witness, John V. Melillo, with respect to Party Depot's damages, "should be disregarded in its entirety . . . ." On appeal, the city does not raise a claim of error with respect to the fact that the court denied the motion for remittitur on this alternative ground.

John Girolametti, he had received a payment of $280,000 as a result of the settlement in connection with his suit against Larrabee .[23] Thus, the city argued that, for the court not to reduce the damages awarded by the jury by $280,000, "would result in the jury award against the [city] far exceeding what is fair and reasonable and would be unconscionable." The plaintiffs filed an objection to the city's motion. By order of March 27, 2024, the court denied the motion for remittitur. After setting forth the correct legal standard, the court stated: "As it is not manifest that the jury included items of damage that are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions, the motion for remittitur is hereby denied."

As it did before the trial court, the city argues that the evidence offered at trial as to the plaintiffs' lost profits and economic damages amounted to $16,655,826.44, and that the jury awarded the plaintiff $16,593,750. The city argues that there was no evidence offered at trial, or jury instructions given to the jury by the court, which provided a scenario in which the total amount of compensation received by the plaintiffs could *exceed* the amount the jury awarded under any circumstances, and, therefore, the trial court abused its discretion in not ordering a remittitur of $280,000.

The plaintiffs argue that there was no proof by the city that the $280,000 received by the plaintiffs on account of settlement negotiations was duplicative of any damages awarded against the city nor that any of the $280,000 in settlement proceeds was "unconscionably excessive" as a matter of law. The plaintiffs argue that the city failed to carry its burden of proving that there was any "duplicat[ive]" or "double recovery" to what the jury

---

[23] Prior to the city's filing of its motion for remittitur, the city and Schullery sought a hearing for the purpose of determining whether the plaintiffs had received any settlement proceeds in this action. In their objection to this motion, the plaintiffs attached an affidavit of John Girolametti, dated October 18, 2023, in which he averred in part that he had received $280,000 in settlement proceeds in connection with the plaintiffs' action against Larrabee.

awarded against the city. The plaintiffs argue that, even if the city had established such a duplication, "General Statutes § 52-216a . . . would permit a jury award to be reduced by amounts obtained per such *settlements only if the court determines that the settlement payments, when added to the jury award, render that award excessive as a matter of law. The threshold is met only when the total amount received so far exceeds what is fair and reasonable as to be unconscionable.*" (Emphasis in original.) The plaintiff argues that "[i]n no way could $280,000 ever be found to be 'unconscionably excessive' in relationship to a jury verdict of $16,593,750, *which is less than 1.7 percent more than the jury verdict against the city alone.*" (Emphasis in original.)

Before addressing the city's claim, we set forth the following applicable legal principles and standard of review. Section 52-216a provides in relevant part: "An agreement with any tortfeasor not to bring legal action or a release of a tortfeasor in any cause of action shall not be read to a jury or in any other way introduced in evidence by either party at any time during the trial of the cause of action against any other joint tortfeasors, nor shall any other agreement not to sue or release of claim among any plaintiffs or defendants in the action be read or in any other way introduced to a jury. If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . ."

This court has explained the circumstances under which a remittitur should be granted: "[I]n determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test [that] must be applied to the verdict by the trial court is whether the jury's award falls

somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has awarded damages that] are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions. . . . Accordingly, we consistently have held that a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances . . . and [when] the court can articulate very clear, definite and satisfactory reasons . . . for such interference. . . . The inquiry into whether a damages award shocks the sense of justice is not intended to detect the kind of shock that arises from a moral outrage but, instead, refers to the distress that may be felt when the requirement of reasonableness has been abandoned in a setting in which reason is a necessary element of any legitimate outcome. If the verdict cannot be explained rationally, then the trial court may presume that it is tainted by improper considerations. . . .

"[O]ur review of the trial court's decision [to grant or deny a remittitur] requires careful balancing. . . . [T]he decision whether to reduce a jury verdict because it is excessive as a matter of law . . . rests solely within the discretion of the trial court. . . . [T]he same general principles apply to a trial court's decision to order a remittitur. [Consequently], the proper standard of review . . . is that of an abuse of discretion. . . . [T]he ruling of the trial court . . . is entitled to great weight and every reasonable presumption should be given in favor of its correctness. . . . The chief rationale that has been articulated in support of this deferential standard of review is that the trial court, having observed the trial and evaluated the testimony firsthand, is better positioned than a reviewing court to assess both the aptness of the

award and whether the jury may have been motivated by improper sympathy, partiality, or prejudice. . . .

"[A]lthough the trial court has a broad legal discretion in this area, it is not without its limits. . . . Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. . . . Furthermore, [t]he size of the verdict alone does not determine whether it is excessive. . . . Thus, [i]n ruling on the motion for remittitur, the trial court [is] obliged to view the evidence in the light most favorable to the plaintiff in determining whether the verdict returned [is] reasonably supported thereby. . . . A conclusion that the jury exercised merely poor judgment is an insufficient basis for ordering a remittitur. . . . A generous award of . . . damages should be sustained if it does not shock the sense of justice. . . . The fact that the jury returns a verdict in excess of what the trial judge would have awarded does not alone establish that the verdict was excessive. . . . [T]he court should not act as the seventh juror with absolute veto power. Whether the court would have reached a different [result] is not in itself decisive. . . . The court's proper function is to determine whether the evidence, reviewed in a light most favorable to the prevailing party, reasonably supports the jury's verdict. . . . In determining whether the court abused its discretion, therefore, we must examine the evidential basis of the verdict itself . . . . [T]he court's action cannot be reviewed in a vacuum. The evidential underpinnings of the verdict itself must be examined." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Lafferty* v. *Jones*, 229 Conn. App. 487, 531–33, 327 A.3d 94 (2024), cert. denied, 351 Conn. 923, 333 A.3d 105 (2025), and cert. denied, 351 Conn. 923, 333 A.3d 106 (2025), cert. denied,    U.S.   , 146 S. Ct. 301, 223 L. Ed. 2d 124 (2025).

We recognize that, in the present case, the city did not seek a remittitur on the ground that *the jury* exercised

poor judgment in its evaluation of the evidence or its award of damages. Instead, the city argued before the trial court and currently argues before this court that the trial court should have subtracted $280,000 from the jury's award of $16,593,750 to account for the presuit settlement proceeds that the plaintiffs received from the former defendant, Larrabee . The city argues that any recovery that exceeds what the evidence established was excessive. The city does not claim that the damages awarded against the city are excessive because they are so great as to be manifestly unjust in light of the nature and extent of the injuries suffered by the plaintiffs, but, rather, that a remittitur is required because the award is duplicative. The city argues that, unless the jury's award is reduced by the amount of the presuit settlement proceeds that the plaintiffs received, the plaintiffs' total recovery will greatly exceed the compensation that the jury determined to be fair and appropriate as reflected in the evidence and the jury's verdict. In substance, the city is arguing that the award is excessive because the settlement amount paid to the plaintiffs violates the one satisfaction rule, a rule that is based on the disfavor of double recoveries under the common law.

"[T]he rule precluding double recovery is a simple and time-honored maxim that [a] plaintiff may be compensated only once for his just damages for the same injury. . . . Connecticut courts consistently have upheld and endorsed the principle that a litigant may recover just damages for the same loss only once. The social policy behind this concept is that it is a waste of society's economic resources to do more than compensate an injured party for a loss and, therefore, that the judicial machinery should not be engaged in shifting a loss in order to create such an economic waste." (Internal quotation marks omitted.) *Mahon* v. *B.V. Unitron Mfg., Inc.*, 284 Conn. 645, 663, 935 A.2d 1004 (2007).

The legislature, however, "by virtue of its enactment of §52-216a,[24] [has] altered the common-law rule requiring

[24] As stated previously in this opinion, General Statutes §52-216a provides in relevant part: "An agreement with any tortfeasor not to

deduction of preverdict payments from verdicts. (Footnote added.) *Seals* v. *Hickey*, 186 Conn. 337, 346, 441 A.2d 604 (1982); see also *Bovat* v. *Waterbury*, [258 Conn. 574, 599, 783 A.2d 1001 (2001)] (§ 52-216a abrogated common-law rule barring windfall of double recovery). Thus, these cases make it abundantly clear that, under § 52-216a, a trial court may, in the exercise of its discretion, reduce a jury award to account for pretrial settlement payments. Before doing so, however, the court first must determine that the settlement payments, when added to the jury award, render that award excessive as a matter of law, a threshold that is met only when the total amount received so far exceeds what is fair and reasonable as to be unconscionable." (Footnote added; internal quotation marks omitted.) *Mahon* v. *B.V. Unitron Mfg., Inc.*, supra, 284 Conn. 664–65.

Our Supreme Court has construed § 52-216a to permit "a payment by one joint tortfeasor resulting from a settlement before trial to reduce a jury verdict against another joint tortfeasor only where the verdict otherwise would be excessive as a matter of law. In making its postverdict determination on the issue of any claimed excessiveness . . . the trial court [is] directed to consider the amount of money paid to a plaintiff as the result of [a settlement with another tortfeasor]." (Footnote omitted; internal quotation marks omitted.) *Alfano* v. *Ins. Center of Torrington*, 203 Conn. 607, 610, 525 A.2d 1338 (1987).

Where the loss, however, is readily ascertainable and absolute, and represents "a legally unassailable determination of fair compensation for the plaintiff's loss,"

bring legal action or a release of a tortfeasor in any cause of action shall not be read to a jury or in any other way introduced in evidence by either party at any time during the trial of the cause of action against any other joint tortfeasors, nor shall any other agreement not to sue or release of claim among any plaintiffs or defendants in the action be read or in any other way introduced to a jury. If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . ."

any additional compensation received by the plaintiff from presuit settlement proceeds renders the plaintiff's total recovery excessive as a matter of law. Id., 611; see also *Mahon* v. *B.V. Unitron Mfg., Inc.*, supra, 284 Conn. 666–70; *Mauro* v. *Yale-New Haven Hospital*, 31 Conn. App. 584, 588–89, 627 A.2d 443 (1993).

Our Supreme Court's analysis in *Alfano* guides our resolution of the present claim. In *Alfano*, the plaintiff, Raymond G. Alfano, brought an action against the defendant insurance agency, alleging that the agency negligently failed to procure fire insurance coverage for a building that the plaintiff had purchased three days before it was destroyed by fire. *Alfano* v. *Ins. Center of Torrington*, supra, 203 Conn. 608. Alfano's complaint also contained a count in which he asserted a malpractice claim against the attorney who had represented him at the closing on the building. Id. Alfano claimed that the attorney failed to advise him of the need to purchase fire insurance for the building. Id. Before trial, Alfano settled the claim against the attorney for $15,000. Id. Thereafter, a jury returned a verdict against the agency in the amount of $30,000 but also found Alfano 35 percent contributorily negligent and, accordingly, reduced the award to $19,500. Id. The trial court denied the agency's motion to set aside the verdict but, under § 52-216a, ordered a remittitur of $15,000, the amount that Alfano had received from the attorney in settlement of his malpractice claim. Id.

On appeal, Alfano claimed that the remittitur was improper because there was evidence before the jury to support a substantially higher valuation of the building than that found by the jury. Id., 609. In rejecting Alfano's contention, our Supreme Court explained that, although there had been some evidence to support a higher valuation of the building, there also was ample evidence to support the jury's finding. See id., 610. The court further explained that, although Alfano had alleged additional elements of damage, such as the rental value of the building from the date of the fire, interest, and attorney's fees, he had not challenged the trial court's

decision not to submit those items to the jury for its consideration. Id. Thus, the court concluded that the jury's finding of damages "must be deemed a proper basis for the trial court to have relied [on] in ordering the remittitur." Id.

The Supreme Court concluded in *Alfano* that the trial court had not abused its discretion in determining that the verdict, when considered with the settlement payment that Alfano had received from the attorney, was excessive. Id., 611. Specifically, the court stated: "It can hardly be disputed that . . . the award of $19,500 to [Alfano] was excessive as a matter of law, because, when the $15,000 received in the settlement with his attorney is added to that sum, [Alfano] would receive total compensation of $34,500. This amount is $4500 greater than the jury's finding of $30,000 as the amount of [Alfano's] loss from the fire. The verdict was, therefore, excessive as a matter of law by $4500, even if the jury had made no deduction for the contributory negligence of [Alfano]." Id. The court further observed that, with respect to the net jury award of $19,500, because "the resulting verdict of $19,500 represent[ed] a legally unassailable determination of fair compensation for [Alfano's] loss under our comparative negligence statute . . . any additional compensation received by [Alfano] for that loss must be deemed excessive as a matter of law. Accordingly, the trial court's order that [Alfano] remit the $15,000 he had received in the settlement of his claim against his attorney, of which the jury was unaware in rendering its verdict, was entirely appropriate . . . ." Id.

This court must therefore determine whether, as in *Alfano*, the jury's award of economic loss and lost profits damages are ascertainable, fixed, and absolute, whereby "any additional compensation received by the plaintiff[s] for that loss must be deemed excessive as a matter of law"; id.; and, therefore, the court, by not reducing the jury's award by the presuit amount, abused its discretion.

In the present case, the jury heard testimony concerning the plaintiffs' economic damages from John Melillo,

a certified public accountant who provided accounting and counseling services to the plaintiffs. Melillo testified that John Girolametti and Cindy Girolametti, as the business owners, separated their real estate, 43 South Street, from their operating business, Party Depot. The subject property was leased by 43 South Street to Party Depot, and the rent payments were needed to pay back the construction loan for the project at issue. Melillo testified that he prepared income projections at the time that John Girolametti obtained bank financing for the work to be performed at 43 South Street and, after John Girolametti and Cindy Girolametti were left with an impaired structure, he assessed the resulting economic losses suffered by 43 South Street and Party Depot.

As Melillo testified, "the whole idea was to build out this [existing] building and expand its footprint to . . . expand an existing wholesale line . . . . So, they're going to put in two floors, a showroom space down below for wholesale goods and then a storage space up top where they can keep bulk items. And, because . . . the building wasn't up to the ability to handle the weight, [John Girolametti] couldn't do that, he couldn't use that building.

"So, my job was to figure out, okay, if he did use that building, how . . . would we be reasonably sure he would've had sales there, and if he didn't have sales there, he had a loss because why would he . . . build the building out anyway. You . . . wouldn't do it unless you had an anticipation of profit.

"And once you couldn't use the building then no sales, which we fully anticipated to be realized, didn't happen. And because those sales didn't happen, Party Depot . . . had to rely on its existing business to try and cover the bank loan. And so, he had a loss of rent, available rent, and you had a loss of profit from sales."

Melillo explained that, in calculating damages, he relied on data pertaining to retail and wholesale sales from the existing Party Depot location at 43 South Street in Danbury, as well as the Party Depot location on Federal

Road in Danbury. Melillo also relied on information provided to him by John Girolametti about these businesses, as he had knowledge about what was "happening" in both of these stores owned by him.

With respect to losses incurred by Party Depot, Melillo first attempted to determine what sales were lost as a result of building deficiencies, including the fact that rental income was not generated in connection with the second floor. He then attempted to determine what additional costs were incurred by the plaintiffs in connection with the building that they were unable to use. These included costs associated with taxes, utilities, insurance, and elevator maintenance. Melillo testified: "What we tried to do is to figure out a square footage of what . . . was going to be built out on South Street, and then figure out on a per square foot basis what the sales were going to be for those square feet that were built." In this calculation, Melillo utilized data from the plaintiffs' actual wholesale sales history, between 2008 and 2022, at two retail locations, including at the plaintiffs' 43 South Street location. Melillo also testified that he attempted to determine what gross profits were realized by the plaintiffs related to those wholesale sales. Ultimately, Melillo, relying on the data from the other Party Depot locations until the time of trial, determined what he believed Party Depot could earn "on a per square foot basis" at the new structure if it was utilized for the purposes for which it was intended.[25]

Melillo opined that, between 2008 and 2022, the Party Depot sustained lost profits damages of $5,858,573, lost rent connected with the second floor of the structure in the amount of $791,667, lost rent connected with the first floor of the structure in the amount of $3,199,268, and additional expenses of $147,557.[26] Melillo testified

[25] Melillo testified that "the plan was to build out 10,800 feet for sale space at . . . $90.43 a foot of sales, [and] we came up with an annual sales value a little bit under a million dollars each year that we were anticipating." He then testified that the impairment of the ability to use the wholesale display area at the store resulted in lost profits of $5,858,573.

[26] These additional expenses were related to utility charges, elevator costs, and insurance.

that, after subtracting additional costs that would have been incurred by the plaintiffs if the business had been operational, Party Depot sustained economic damages, including lost profits, totaling $9,604,301.

Melillo testified that he provided an estimate of losses incurred by 43 South Street, which included the loss of income from self storage units, of varying sizes, that the plaintiffs intended to rent to members of the public on the second floor of the structure. Melillo, relying on John Girolametti's plans as well as research from outside sources, developed an expectation about the profits that 43 South Street could have realized from renting such units. Subtracting the cost of the self storage units spread out over a twenty year period, Melillo opined that 43 South Street could have obtained rent totaling $732,923 in connection with the self storage space on the second floor of the structure. After adding extra real estate taxes paid by 43 South Street, Melillo opined that 43 South Street incurred economic damages totaling $1,164,603 as a result of the impairment of the structure. Thus, Melillo opined that Party Depot and 43 South Street incurred losses totaling $10,768,904. Subsequently, Melillo testified during cross-examination that there was an error in one of the schedules on which he relied concerning rent paid by Party Depot, which ultimately reduced the losses he estimated by $211,922, resulting in total losses of $10,556,982.

The plaintiffs presented testimony from Steven M. DeBaise, a general contractor, with respect to the other major component of their damages, namely, the cost of remedial measures needed at the subject property to correct the structural deficiencies at the heart of the underlying lawsuits. DeBaise testified that he separated the work to be performed into distinct phases. Before calculating a specific estimate for each phase, he studied plans for the remedial work that needed to be performed, visited the site, and used an established methodology for arriving at a competitive price for the work to be performed. This included estimating the materials needed to

perform the work, the cost of those materials, the labor necessary to perform the repairs, the cost of the labor, the cost of overhead, and the profit that he wanted to make for performing the repairs. DeBaise testified that his estimate also included costs related to permits, an office trailer, temporary restrooms, temporary fencing, rental equipment, forklifts, hoisting equipment, dumpsters, and sales tax where necessary. DeBaise testified that he had employed this methodology perhaps thousands of times in his career in developing competitive estimates for construction projects.

With respect to the first phase of the remedial work, DeBaise testified: "[T]he first item I looked at is taking the roof off. Removing the [heating, ventilating, and air conditioning (HVAC)] equipment that's already there, and duct work. And then I worked down to the framing, the stud walls, the new walls holding the structure. And then what it was going to take to put it back. Maintain a cover while you take it off, because to store it down below you've got to cover it somehow and try to maintain that. Then I had to put back the sprinklers, the HVAC system, a new steel . . . frame for that HVAC equipment. There ended up to be some draining—drainage installed and [structures] to get the water to run to where it had to go. Which all is entailed in this estimate."

DeBaise testified that he employed the same methodology in arriving at an estimate for the other phases of the project. The second phase included replacing the structural elements of the pre-engineered building and its foundation system, which failed to meet building code requirements. The third phase included removing lights, sprinklers, and ceiling and completely replacing the second floor metal deck and reinforcing the concrete slab in the new building, which is currently incapable of supporting loads as required by the building code. The fourth phase included reconstructing the first floor garage structure foundation under the new building so that it is compliant with the building code. The fifth phase included the demolition and replacement of interior

stairs. The sixth phase included the repair of the retaining wall in the front of the building. The seventh phase included repairs to the front of the building. The eighth phase included the cost of repairs for the demolition and reconstruction of mechanical, electrical, plumbing, and fire protection sprinkler systems which were not accounted for in other aspects of his estimate. The ninth phase included the cost of salvaging and reusing building components that needed to be removed while remedial work was performed. The final phase of the overall estimate included the cost of architecture, engineering, and consultation services, as well as the costs related to certification by a licensed design professional.

DeBaise arrived at an initial estimate that was based on labor and material costs as of January 13, 2014. He then updated his estimate based on labor and material costs at the time of trial, arriving at an estimate of $5,544,404.04. After adding a minimum 10 percent contingency cost to that amount,[27] as DeBaise testified was customary, his estimate for the fair market value of remedial measures was $6,098,844.44.

During closing argument, the plaintiffs' attorney relied on the economic damages calculation made by Melillo in the amount of $10,556,982 and the remedial damages calculation made by DeBaise in the amount of $6,098,844.44. Thus, the plaintiffs' attorney, referring to the two types of specific damage estimates, asked the jury to award "the real remedial damages of six million one. And also, the total economic damages and [lost] profits of ten million five."

As stated previously, in connection with the postverdict motion for remittitur filed by the city, the court had before it the affidavit of John Girolametti that the plaintiffs had received $280,000 in settlement proceeds

[27] DeBaise testified that, because of expected fluctuations in market and labor costs, the fair market value of the repairs was expected to be "at least 10 percent" higher than his underlying calculations. Thus, the final estimate provided by DeBaise accounted for expected fluctuations in cost.

in connection with their action brought against Larrabee. There is no dispute that that action was part of the consolidated cases brought by the plaintiffs in connection with the construction project at issue in the actions underlying this appeal. As stated previously, the court, in denying the motion for remittitur, reasoned that the jury had not included items of damage that are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions. Although we are mindful of the court's wide discretion in ruling on motions for remittitur, we are persuaded that the court erred in focusing solely on whether the evidence supported the jury's award. Here, the issue was whether the jury's award was excessive as a matter of law and should have been reduced in light of the settlement proceeds received by the plaintiffs. Evidence of the pretrial settlement was properly not before the jury and, thus, the jury did not consider the settlement proceeds paid to the plaintiffs in calculating the plaintiffs' compensable losses. Because the motion for remittitur was based on those settlement proceeds, the court should have considered them, along with the jury's verdicts, in determining whether the verdicts were excessive as a matter of law.

We are mindful that, in light of the claims brought by the plaintiffs, the damage award encompassed economic compensation for damages, including lost profits and remedial measures to their damaged structure. As the evidence reflected, these types of damages, unlike damages for pain and suffering, are capable of being reduced to a specific dollar amount. Cf. *Munn* v. *Hotchkiss School*, 326 Conn. 540, 577, 165 A.3d 1167 (2017) (describing damages for pain and suffering as damages that "lie in an extremely uncertain area . . . one in which it is quite impossible to assign values with any precision, and, therefore, are best left to a jury" (internal quotation marks omitted)). Here, the plaintiffs' evidence of damages, which was based on the testimony of Melillo and DeBaise, supported an award of damages in the amount of $16,655,826.44. The jury awarded damages in the amount of $16,593,750, which is $62,076.44 less than

that amount. Although the jury did not award the exact amount sought by the plaintiffs, it awarded the plaintiffs an amount that was less than one half of 1 percent of the amount specifically sought by the plaintiffs.[28]

It is significant to our analysis that neither Melillo nor DeBaise suggested a permissible range of damages. Each witness used a methodology, supported by ascertainable data and factual assumptions, by which each one arrived at a specific award. Their testimony did not suggest that additional damages were warranted. Consistent with their testimony, the plaintiffs' attorney invited the jury to base its award on the damages estimates of Melillo and DeBaise. Thus, the jury's award of economic loss and lost profits was based on evidence that was ascertainable, fixed, and absolute.

In light of the evidence of damages, as well as the nature of the damages at issue, we are persuaded that the settlement payment, when added to the jury's award, renders that award excessive as a matter of law. For the plaintiffs to recover the jury's award *and* the settlement payment would result in a level of compensation that so exceeds the evidence of what is fair and reasonable as to be unconscionable. Consistent with the authority set forth in this opinion, any additional compensation received by the plaintiffs is excessive as a matter of law.

For the foregoing reasons, we conclude that the court abused its discretion in denying the city's motion for remittitur and that it is appropriate for the jury's award of damages to be reduced by $280,000, the amount of the pretrial settlement proceeds received by the plaintiffs. Because there are no factual issues in dispute with respect to the amount of the jury's award and the amount of the settlement proceeds, the proper remedy is to remand the

---

[28] We observe that "a jury may award a plaintiff less than the full amount of claimed economic damages when there is conflicting evidence as to whether the defendant caused the full extent of the claimed economic damages." *DeEsso* v. *Litzie*, 172 Conn. App. 787, 800, 163 A.3d 55, cert. denied, 326 Conn. 913, 173 A.3d 389 (2017).

case to the trial court with direction to grant the city's motion for a remittitur.

## II

## AC 47563

We next turn to the claim raised on appeal by Edward Schullery. In their third amended complaint, the plaintiffs alleged that Schullery was an employee of the city and, at times relevant, was acting through the city's Department of Buildings as a deputy building inspector. The plaintiffs alleged that Schullery's acts and omissions were within the scope of his employment. In count one, the plaintiffs alleged under §52-557n (b) (7) that the city, Null, and Schullery acted in reckless disregard for health and safety with respect to the issuance of building permits and the issuance of a certificate of occupancy. In count two, the plaintiffs alleged under §52-557n (b) (8) that the city, Null, and Schullery acted in reckless disregard for health and safety with respect to conducting inspections and/or failing to make inspections required by the code. In our discussion of the plaintiffs' claims brought against the city in part I B of this opinion, we set forth the detailed allegations on which the plaintiffs relied in counts one and two.

Following the jury's verdict in favor of the plaintiffs as against Schullery in the amount of $250,000, Schullery, like the city, filed a motion to set aside the verdict and for a judgment notwithstanding the verdict. In the memorandum of law accompanying the motion, Schullery argued that there was insufficient evidence to support a verdict against him under counts two and three of the plaintiff's third amended complaint. In its memorandum of decision denying Schullery's motion, as well as the similar motion filed by the city that we addressed in part I B of this opinion, the court concluded that "[m]ore than sufficient evidence—both testimonial and documentary, fact and expert—was introduced to support the jury's conclusion that the defendants acted

in reckless disregard for health and safety in connection with the subject property."

Schullery's motion mirrors the motion for a directed verdict and for a judgment notwithstanding the verdict that was filed by the city. Similarly, his appellate arguments challenging the denial of that motion mirror those made by the city concerning the denial of its motion for a directed verdict and for a judgment notwithstanding the verdict.[29] Relying on the analysis set forth in part

[29] Schullery acknowledges that he "had the most involvement of all city employees who dealt with the plaintiffs' construction project." The evidence reflects that Null issued the certificate of occupancy just days after Schullery conducted a final building inspection, which Schullery approved. This final approval occurred after Schullery acknowledged in a July 25, 2008 letter to John Girolametti that his office still lacked materials necessary to issue a certificate of occupancy. Schullery argues that the evidence reflects that he made "judgment calls" throughout his involvement with the project, but the evidence did not reflect a reckless disregard for health and safety. The evidence discussed in part I B of this opinion undermines his arguments.

In count four of their third amended complaint, the plaintiffs, relying on facts alleged in prior counts of the complaint, alleged that Schullery and Null committed various acts and omissions with respect to the plaintiffs' building project and that their conduct "was committed with malice, wantonness or intent to injure the plaintiffs." Moreover, the plaintiffs alleged in count four that, "[a]s a result of the malicious, wanton or intentional conduct of . . . Null and . . . Schullery, the plaintiffs have suffered damages." In challenging the verdict returned against him by the jury in counts one and two of the plaintiffs' third amended complaint, Schullery also relies on the fact that the jury found in connection with count four that he did not engage in conduct that was malicious, wanton, or with intent to injure the plaintiffs. Schullery argues that "[n]o verdict against [him] for recklessness can stand under circumstances where the jury has made a finding that [he] did not act maliciously, wantonly or intentionally." Schullery's argument is not persuasive for several reasons. We recognize that, although the plaintiffs did not allege reckless conduct in count four, our Supreme Court has characterized reckless conduct as being legally "indistinguishable" from malicious, wanton, and intentional conduct. *Elliott* v. *Waterbury*, 245 Conn. 385, 415, 715 A.2d 27 (1998). The causes of action alleged in counts one and two, however, were not common-law tort actions. Instead, they were brought under § 52-557n (b), and they required proof of a reckless disregard for health and safety in failing to follow the building code in connection with issuing permits and conducting inspections. Although our Supreme Court in *Williams* reasoned that the common-law definition of recklessness is *instructive* in applying

I B of this opinion, we likewise conclude that the court properly rejected Schullery's claim that the judgment rendered against him should be set aside on the ground that it was contrary to the evidence. Schullery has not demonstrated that the court erred in denying his motion for a directed verdict and for a judgment notwithstanding the verdict.

The judgments are reversed in part and the cases are remanded with direction to grant the city's motion for remittitur; the judgments are affirmed in all other respects.

In this opinion the other judges concurred.

---

§52-557n (b); *Williams* v. *Housing Authority*, supra, 327 Conn. 384; we do not read that decision to support the proposition that actions brought under the statute are equivalent to actions for recklessness under the common law. Thus, Schullery is unable to demonstrate that the verdicts returned by the jury were in any way inconsistent.